THE PEOPLE *ex rel.* W. H. Stead, Attorney General, *et al.* Appellants, *vs.* THE SPRING LAKE DRAINAGE AND LEVEE DISTRICT *et al.* Appellees.

*Opinion filed February 23, 1912—Rehearing denied April 3, 1912.*

1. JUDGMENTS AND DECREES—*consent decree is conclusive upon the consenting parties.* A consent decree is based upon the agreement of the parties, which may supersede both pleadings and evidence and even go to the extent of pointing out and limiting the relief to be granted; and such a decree is conclusive upon the consenting parties and cannot be amended or varied without a like consent, nor can it be appealed from or reviewed by writ of error.

2. SAME—*what is not strictly a consent decree.* A decree dismissing a bill in equity "as per the following stipulation now filed herein" is not a consent decree to the extent that the terms of the stipulation must be regarded as embodied in the decree and the stipulation be regarded as *res judicata* of the matters therein contained, even though a copy of the stipulation was entered on the records of the court, where the court was not asked to approve the terms of the stipulation and enter the same in the form of a consent decree, except as to the order of dismissal.

3. STIPULATIONS—*a stipulation is unlike ordinary contracts.* A stipulation concerning a cause pending in court is unlike ordinary contracts between parties not in court, as no consideration or mutuality is required and it may bind those incapable of binding themselves out of court and is subject to the supervision of court.

4. SAME—*stipulations by parties or their attorneys will be enforced.* Stipulations entered into by parties to a suit or their attorneys in respect to the conduct or control of their rights in the trial of the cause will be enforced by the courts unless they are unreasonable or contrary to public morals; and it is the policy of the courts to enforce stipulations fairly made, unless good cause is shown to the contrary.

5. SAME—*power of court to enforce stipulation.* The power of a court to enforce, in a summary manner, a stipulation concerning the conduct of a suit exists while the court has jurisdiction of the cause, and even though such power may be lost with the termination of jurisdiction of the parties and the cause, yet a stipulation touching a party's substantial rights may be enforced by an independent action at law or appropriate remedy in equity.

6. SAME—*courts look with favor upon stipulations designed to simplify litigation.* Courts look with favor upon stipulations de-

signed to simplify, shorten or settle litigation and save costs to the parties, and will, when called upon in an appropriate manner, whether by a summary method in a pending cause or in an independent action, compel parties to observe them, unless they are illegal or contrary to public policy.

7. DRAINAGE—*powers of drainage district.* A drainage district organized under the statutes of Illinois is a municipal corporation for a special and limited purpose and has such powers as are deemed essential for the accomplishment of its objects.

8. SAME—*a drainage district has the power to make necessary contracts.* The chief distinction between a municipal corporation proper, and a *quasi* municipal corporation, such as a drainage district, is, that the former, only, has power to make local laws; but both classes have an implied power to make contracts necessary to enable them to exercise the powers and perform the duties which are conferred upon them by law.

9. SAME—*the authority of drainage commissioners to contract.* Under section 28 of the Levee act a drainage district, by its commissioners, has power to contract and be contracted with and to do and perform "all such acts and things as may be necessary for the accomplishment of the purposes of this act," and a contract by the commissioners is therefore not unauthorized unless the subject matter is wholly foreign to such purposes.

10. SAME—*when validity of stipulation must be tested as of the date when filed.* The validity of a stipulation between drainage commissioners and the Attorney General, relative to the dismissal of à suit to enjoin further work in the district, will be tested as of the date the stipulation was filed by the parties and the dismissal of the bill procured, and if the parties then had power to enter into it, it is immaterial whether or not it would have been enforcible at the time it was tentatively agreed to. (*Badger* v. *Inlet Drainage District,* 141 Ill. 540, distinguished.)

11. SAME—*when subject matter of a contract is not foreign to purposes of district.* An agreement by drainage commissioners to modify the plans of the district by constructing a levee and lock, so that the public right of navigation will not be cut off in a certain body of water, and to dredge out a channel below the dam and keep the same in repair, concerns a subject matter within the purposes for which the district was organized.

12. SAME—*when stipulation for dismissing bill is binding.* A stipulation between drainage commissioners and the Attorney General whereby a suit by the latter to enjoin further work in the district as an interference with navigation was to be dismissed if the commissioners would modify their original plans, with the approval

of the county court, after notice and a hearing, so as to provide, without increasing the cost to the district, a method of keeping such navigation open, is within the power of the parties, and, when duly carried out according to its terms, is binding upon them.

13. PUBLIC OFFICERS—*Attorney General has power to dismiss a suit, with or without stipulation.* The Attorney General is the representative of the people and may make any disposition of a suit brought by him which he deems to be for the best interest of the State, and may dismiss such a suit, with or without a stipulation.

APPEAL from the Circuit Court of Tazewell county; the Hon. T. M. HARRIS, Judge, presiding.

W. H. STEAD, Attorney General, THOMAS E. DEMPCY, JUNE C. SMITH, and GEORGE B. FOSTER, (NOLEMAN & SMITH, of counsel,) for appellants.

PRETTYMAN, VELDE & PRETTYMAN, POTTS & CONAGHAN, and W. R. CURRAN, for appellees.

Mr. JUSTICE VICKERS delivered the opinion of the court:

Two suits in equity were pending in the circuit court of Tazewell county, both of which involved substantially the same questions and the same parties. The causes were consolidated and heard together and a decree rendered which determined the questions involved in both causes. One of these bills was filed by the Spring Lake Drainage and Levee District and others against the Canal Commissioners of the State of Illinois, W. H. Stead, Attorney General, and others, and its purpose was to enjoin the defendants from interfering with the drainage district in the construction and completion of a levee or embankment across the natural outlet of Spring lake. The other bill was filed by the Attorney General and the Canal Commissioners, and purpose was to enjoin the drainage district from const ing certain levees and embankments, the effect of would be to destroy navigation upon Spring lake. sult of the hearing of the consolidated case was

tion of a decree dismissing the bill filed by the Attorney General and others for want of equity and granting the relief prayed for in the bill filed by the drainage district. The present appeal is prosecuted by the complainants below in the bill filed by the Attorney General and the defendants below in the other bill.

Since all of the questions and the material facts necessary to their determination are fully presented in the proceeding by the Attorney General for an injunction against the drainage district, it will only be necessary to treat the consolidated cases as one case, and in so doing the People of the State of Illinois, represented by the Attorney General, and the Canal Commissioners of the State of Illinois, will hereinafter be referred to as appellants, and the commissioners of the drainage district will be referred to as appellees.

In order to understand the nature of this controversy it will be necessary to give a general description of Spring lake and the territory surrounding it, which are embraced within the boundaries of Spring Lake Drainage and Levee District.

Spring lake is a body of water about nine miles long and from one hundred yards to a half mile in width in its natural condition. The lake extends north-easterly and south-westerly, almost parallel with the eastern bank of the Illinois river but at some distance therefrom. At the southerly end the lake is connected with the Illinois river by an outlet extending easterly for about a quarter of a mile, thence turning northerly into the lake proper. Between the lake and Illinois river there is a large body of swamp land, containing about fourteen thousand acres, which is braced within the drainage district. Substantially all of body of land is subject to overflow from the Illinois t times of extreme high water. The object in organiz e drainage district was to reclaim the lands lying bet the Illinois river and Spring lake, and other ad-

jacent swamp lands, by the construction of a levee on the southerly bank of the Illinois river and across the southerly outlet of Spring lake to the bluffs, and construct ditches and establish a pumping station to pump the water out of the basin enclosed within the levee and the bluffs southeasterly of Spring lake. In 1877 the legislature of the State made an appropriation for the construction of what is known as the Copperas Creek lock and dam in the Illinois river, which was constructed about three miles north of the point where the outlet of Spring lake connects with the river. After the Copperas Creek dam was constructed a wing dam was built connecting with said dam and extending south-easterly across the low lands between Spring lake and the river and across Spring lake to the bluffs, in order to impound the water above the Copperas Creek dam and thereby raise the water level in the Illinois river. The effect of constructing the wing dam from the Copperas Creek lock to the bluffs and across Spring lake was to prevent boats of any considerable draft from entering the lake through its natural outlet or from passing from the lake over the wing dam to the river. In order to obviate this difficulty and to re-establish navigation on Spring lake in connection with the Illinois river, the legislature appropriated $6200 out of the net revenues received by the canal commissioners for the purpose of constructing a canal from the Illinois river to Spring lake above the Copperas Creek dam. In pursuance of this act of the legislature the canal commissioners constructed a canal from the northerly end of Mud lake to the Illinois river. This canal was completed in 1879 and afforded a channel for navigation from the Illinois river through the canal to Mud lake and thence through Mud lake to Spring lake, these two lakes being connected in their natural condition. This canal entered the Illinois river seven or eight miles above Copperas Creek lock and dam, and was used, after its completion, as a means of ingress and egress between the river and Spring

lake by steamboats and other water crafts navigating the Illinois river and Spring lake. This canal remained open until the summer of 1909, when a dike or levee was constructed across the same by appellees near the Illinois river, thereby again cutting off Spring lake from any connection with the Illinois river. In 1903 the Spring Lake Drainage and Levee District was organized under the Levee act of Illinois. The district as originally organized included the land lying adjacent to and on both sides of the canal, and also the lands lying between the Illinois river and Spring lake from a point between the northerly end of said lake to a point between the wing dam and the Copperas Creek lock and the outlet of Spring lake to Illinois river at the southerly end. The plans for the drainage of this district included the construction of a levee along the southerly side of the Illinois river and across the canal, and also across Spring lake at the southerly boundary of said district, so as to connect with the bluffs beyond the lake and drain the waters from the lake and wholly destroy navigation thereon. In July, 1905, the Attorney General of the State, on the information of divers parties, filed an information in the nature of a bill in equity in the circuit court of Tazewell county against the Spring Lake Drainage and Levee District and the commissioners thereof, alleging that Spring lake was a navigable body of water the title to which was in the State of Illinois, and alleging that appellees were threatening to construct a dike across the canal connecting the said lake with the Illinois river, and praying that the appellees be perpetually enjoined from so constructing the said dike across the canal or otherwise obstructing or interfering with the free passage of canal boats and other water crafts through said canal and on Spring lake, and from draining or lowering the water in Spring lake or interfering with navigation thereon. Appellees were served with process and appeared in said cause and filed their general and special demurrer to the infor-

mation.   While the cause was pending on demurrer, all of the parties in interest entered into a written stipulation which was intended to be a settlement of all questions involved in the suit then pending.   This stipulation was properly entitled in the cause then pending, and after such title is as follows:

"And now on this day, this cause coming on to be further heard, come again all the parties herein, as heretofore, by their respective solicitors, and now, by agreement of all the parties in the above entitled cause, this cause is now dismissed as per the following stipulation now filed herein, which is in words and figures as follows, to-wit:

"Whereas, there is now pending in the circuit court of Tazewell county, in the State of Illinois, a certain information in equity brought by William H. Stead, Attorney General, for and on behalf of the People of the State of Illinois, and the Canal Commissioners of the State of Illinois, on relation of John Bolander, Edward Bolander, Edward S. Haas, John Huddleston, J. M. Brewer, Edward Bailey, J. C. Losch and Henry Lemm, of said Tazewell county, Illinois, against the Spring Lake Drainage and Levee District in Tazewell county, in the State of Illinois, and Howell J. Puterbaugh, Leonard L. Preston and Joseph Dailey, commissioners of the Spring Lake Drainage and Levee District of Tazewell county, in the State of Illinois, asking certain relief as therein prayed and for an injunction against said defendants to restrain and enjoin them from obstructing, hindering or interfering with the passage of canal boats through the channel from the Illinois river to said Spring lake, and from obstructing or interfering with the navigation and free passage of canal boats and other water crafts upon the water of said Spring lake, and from draining the water from or lowering the water level in said Spring lake, and for certain other relief as therein prayed.

"Now, therefore, for the purpose of settling said litigation to the satisfaction of all parties concerned therein, it

is hereby mutually agreed and stipulated by the parties to said suit as follows: That the plans of said drainage district shall be modified, under the order and direction of the county court of said Tazewell county, so as to provide for a lock in the main channel of Spring lake where the levee upon the south side of said district, as hereinbefore located, crosses said main channel of said Spring lake, of the capacity of thirty-six feet in width by one hundred and fifty feet in length, to accommodate water crafts navigating said Spring lake, and said lock shall be controlled and operated by the said drainage district so as to afford free passage to all boats navigating said Spring lake, without charge for lockage; and upon the construction of the said lock the artificial channel cut and constructed by the Canal Commissioners of the State of Illinois from the Illinois river to afford communication with the Spring lake shall be closed by said drainage district, and the levee built over the same and the levee on the south side of said district, as heretofore planned, shall extend to the bluff on the east side of said lake, and the levee provided for in said original plans to extend from near the south-east corner of said district to Marshall Landing shall be dispensed with and need not be constructed.

"It is further agreed that said drainage district will open the channel of said Spring lake from the mouth of the old Spring lake to Marshall's Landing and bear one-half of the expense of maintaining said channel, Smith-Hippen Company paying the other half of the expense, as provided for in a certain agreement entered into in writing by the commissioners of said Spring Lake Drainage and Levee District in Tazewell county, in the State of Illinois, with Smith-Hippen Company.

"It is agreed that any of said relators owning lands situated above high-water mark on the east side of said district which have not been overflowed by the highest water and which it is claimed will receive no benefit from the

drainage and other improvements of said district, shall submit to the county court of Tazewell county their petition to have said lands released from the assessment heretofore made and that no objection on account of the. Statute of Limitations will be made by said commissioners to such petition, and that the court shall pass upon the matter and adjust such assessment as it may deem equitable and just.

"It is further agreed that upon the carrying out of this agreement by the commissioners of the said Spring Lake Drainage and Levee District in Tazewell county, in the State of Illinois, by modification of the plans of said district as above indicated, and a decree of the county court being entered on the petition of said land owners owning lands which are above high-water mark adjusting or modifying the assessment of the said lands, the suit in equity brought by the Attorney General above mentioned shall be dismissed.—October 30, 1905."

The stipulation was signed by William S. Kellogg, attorney for the commissioners of Spring Lake Drainage and Levee District in Tazewell county, in the State of Illinois; Prettyman & Velde, attorneys; William A. Potts, attorney for John Huddleston, J. M. Brewer, Edward Bailey, George Himmel, Mary Marshall Stout and W. G. Proctor; and William H. Stead, Attorney General.

After the terms of this stipulation had been agreed to, appellees petitioned the county court of Tazewell county to modify the plans of said drainage district so as to authorize the construction of the work required by the terms of said stipulation. The petition of the commissioners filed in the county court set up the stipulation and alleged that the modification was for the best interest of all concerned. The petition was sworn to by the commissioners, (two of whom are still members of the board and appellees herein,) and the prayer of the petition was, that the plans of the district be modified so as to conform to the said stipulation and authorize and direct said commissioners to construct the

lock and maintain the same as provided for in said stipulation. The petition was accompanied by plans, specifications, reports and estimates prepared by the engineer of the appellee district. The estimate of the cost to the district of building the lock, improving the channel of Spring lake and the additional levee work required by the stipulation was $49,740. The work that was eliminated by the stipulation was estimated by the engineer at the same amount, $49,740. In other words, the work required to be constructed by the district under the stipulation would cost the district nothing in addition to the amount that would be required if the original plans of the district were carried out. Upon the hearing in the county court the county court made the following finding: "And it further appearing to the court that the saving to said district by the elimination of the works and improvements above referred to and hereby ordered will equal the cost of said lock and other works and improvements provided for in this decree in lieu of said works and improvements eliminated, and that the said original assessments of benefits to said lands benefited will in each and every instance be unaffected by said changes and modifications of the original plans and specifications of the works and improvements of said district, and the lands of said district will be equally benefited, in every instance, the same as by the said original plans, and that no change in any of said assessments should be made by reason of the change in the plans herein provided for the works and improvements of said district." After the hearing in the county court upon the proposed modification of the plans of the improvements, and after that court had entered its decree, which shows that all of the land owners of the district had been properly notified of the filing of said petition, and said decree had become final, said stipulation was filed in the circuit court of Tazewell county and the order dismissing the original suit of the Attorney General was entered on December 26, 1905. After the chan-

cery suit was dismissed, in 1905, the work of the drainage district proceeded and a large amount of money was expended in the construction of a levee on the southerly bank of the Illinois river, which was extended across the canal, as was contemplated. should be done by the stipulation. Nothing appears to have been done by appellees with reference to the construction of the lock for the Spring lake dam.  In 1909 the commissioners again applied to the county court for an order enlarging and extending the boundaries of the drainage district, and an order was entered in the county court changing the boundaries of the district so as to take in all of Spring lake, including the outlet at the southerly end thereof, to the Illinois river. After this order was made appellees repudiated the stipulation and were threatening to extend their levee across the southern outlet of Spring lake, thereby wholly disregarding the stipulation and attempting to carry out the original scheme of damming up Spring lake at both ends and pumping the water thereof out into the Illinois river.  The bill filed in the present case by appellants seeks to enjoin appellees from thus destroying or interfering with navigation upon Spring lake, and particularly from obstructing the southerly outlet thereof by the construction of the proposed levee across the same.  The allegations of the bill in the present cause are, in substance, the same as the original bill that was dismissed in December, 1905, with the exception that in the present bill the stipulation is set up and relied on as additional ground of relief.

Appellants make three principal contentions in support of their bill:  First, it is contended that the stipulation under which the original bill was dismissed was an adjudication of all the questions in controversy between the parties and affords sufficient ground for equitable relief; second, appellants contend that the evidence shows that Spring lake was meandered by the government, and that the title to the bed of the lake is in the State of Illinois in trust for the

use of the public; third, it is contended on behalf of the State that Spring lake in a state of nature is a navigable body of water, and that the public have the right of navigation upon the same without regard to the ownership of the bed of the lake, and that appellees have no right to interfere with or obstruct navigation thereon. There are some other minor matters relating to the procedure that are discussed by the parties in their briefs, but in the view that we take of this controversy it will not be necessary to refer to or discuss those questions.

Appellees' answer to appellants' first contention is, that the stipulation set up in the bill was *ultra vires* and therefore void and unenforcible, but it is conceded by appellees that if said stipulation was valid and binding the present proceeding is the proper one for its enforcement. The answers to the second and third contentions are, that they are not supported by the evidence. It is apparent that if either of appellants' contentions is sustained the decree below is erroneous and will have to be reversed.

The validity of the stipulation under which the original suit was dismissed is challenged by appellees as being *ultra vires* the drainage district, and also as being in excess of the powers and authority of the Attorney General. The determination of the questions raised in regard to the validity of the stipulation involves the consideration of several matters. At the very threshold of the controversy in respect to the stipulation we are met with a preliminary question concerning the legal status or character of the instrument under which the original suit was dismissed. Appellants contend that the decree dismissing the suit "as per the following stipulation now filed herein," followed by a recorded copy of the stipulation in the records of the court, makes all of the terms and provisions of the stipulation a part of the decree of the court and imparts thereto the effect and vitality of an adjudication of all matters therein recited, in support of which the rule of *res judicata* may

be invoked to the same extent and with like effect as if the cause had been heard and a formal decree entered embodying the provisions of the stipulation.   On the other hand, appellees contend that the instrument is not a decree in any sense; that it is merely a contract entered into between the parties, and that its legality, as· well as its interpretation and effect, is to be determined by the rules applicable to contracts *inter partes*.   In the view that we have of this preliminary ·question the contention of neither party can be sustained to the full extent insisted upon.   The terms of this agreement were fixed by the parties, and the court was not asked to approve those conditions and enter the same in the form of a consent decree, except as to the order of dismissal.   The legal character of this writing is indicated by ·the name which the parties have given to the document. It is called a "stipulation," and such appears to be its proper legal character.   A decree is· the sentence or order of a court of chancery determining the rights of the parties to a suit pending, according to equity and good conscience. Ordinarily the decree is based upon the proofs and the pleadings.   A consent decree is one based upon the consent or agreement of the parties, which may supersede both pleading and evidence and even go to the extent of pointing out and limiting the relief to be granted.   Such a decree is absolutely conclusive upon the consenting parties and cannot be amended or varied without like consent, nor can it ·be re-heard, appealed from or reviewed upon writ of error.   (*Schmidt* v. *Oregon Gold Mining Co.* 28 Ore. 9; 52 Am. St. Rep. 759.)   It would seem to require no argument to show that the instrument under consideration is neither a decree nor is it a consent decree.   On the other hand,. it is not to be tested exclusively by the rules applicable to simple contracts.   It was, as the parties very appropriately recited in the instrument, "a stipulation," and was entered into between the duly authorized attorneys representing parties to a pending cause in equity, for the pri-

mary purpose of terminating the pending litigation upon terms of mutual concession and obligations between the parties. A stipulation concerning a pending cause in court is an obligation unlike ordinary contracts between parties not in court. (*Ward* v. *Clay,* 82 Cal. 508; *Barry* v. *Mutual Life Ins. Co.* 53 N. Y. 536.) Since no consideration is necessary to its validity (*Howe* v. *Lawrence,* 22 N. J. L. 104,) no mutuality is required, and it may bind those incapable of binding themselves out of court and is subject to the supervision of the court. (20 Ency. of Pl. & Pr. 607.) All stipulations entered into by parties or their attorneys in respect to the conduct or control of their rights in the trial of a cause will be enforced by the courts in a summary manner unless such stipulations are unreasonable or contrary to public morals. Thus, a party to a pending litigation may waive, by stipulation, his statutory or constitutional rights and the court will hold him bound by such stipulation. Parties may waive the issuing and service of process, (*Stone* v. *Bank of Commerce,* 174 U. S. 412,) and may make a valid stipulation that the judgment in one suit shall abide the event of another suit pending between them, involving the same questions. (*Dilworth* v. *Curts,* 139 Ill. 508.) It is the policy of courts to enforce stipulations fairly made between attorneys or parties, relating to the conduct of suits, unless good cause is shown to the contrary. (*Chicago and Northwestern Railway Co.* v. *Hintz,* 132 Ill. 265.) In the *Hintz case,* above cited, the parties, through their attorneys, stipulated in the Appellate Court that the appellant might have until a certain day to file its briefs, with the proviso that if the cause was reached upon the call and the briefs had not been filed ten days before the cause was reached on the calendar the judgment should be affirmed. The briefs had not been filed ten days when the case was reached on call. Appellant had filed a writing purporting to recede from the stipulation. The Appellate Court enforced the stipulation by affirming the

judgment without reference to its merits, and the judgment of that court was affirmed by this court. The benefit of a stipulation made in the progress of a cause in court is usually obtained by calling the court's attention to the stipulation and asking the court to compel the party to observe the terms thereof. (20 Ency. of Pl. & Pr. 668.) The power of the court to attach an attorney and thus compel him to comply with his stipulations has been sustained. (*Blain* v. *Patterson,* 47 N. H. 523; *Masterson* v. *Bockel,* 20 Tex. Civ. App. 416.) The foregoing rule is only applicable to cases pending and undetermined, and the power and jurisdiction of the court to enforce stipulations in a summary manner in the course of a proceeding would cease with the termination of jurisdiction over the cause and parties. Where, by reason of the stipulation or otherwise, the court had lost jurisdiction of the cause, it may well be doubted whether the power of the court could again be invoked, in a summary proceeding, to compel the observance of the terms of a stipulation, but it is not necessary to determine that question here. The law is well settled that a stipulation touching a party's substantial rights may be enforced by an action at law or by a suit for injunction or other appropriate remedy in equity. (20 Ency. of Pl. & Pr. 669, and cases there cited.) Whether the aid of the court is invoked by some summary method during the pendency of the cause or by a resort to another independent action, courts look with favor upon stipulations designed to simplify, shorten or settle litigation and save costs to parties, and will, when called upon in any appropriate manner, compel parties to observe such stipulations unless they are illegal or contrary to public policy. The instrument executed by the parties hereto is not a decree of the court in any proper sense of that term, and it differs from an ordinary simple contract in the particulars above pointed out.

We are next to consider whether the stipulation is invalid for want of power in the parties thereto to enter into

the same. At the time the stipulation was entered into an information in the nature of a bill in equity was pending against the drainage district wherein it was charged that Spring lake was a navigable body of water, and that appellees, in the prosecution of the drainage scheme, were threatening to destroy the right of the public to an easement in the waters of said lake for the purposes of navigation. If the appellants succeeded in their suit and the connections of Spring lake with the Illinois river were left open, the drainage of the swamp lands adjacent to said lake would be very expensive if not practically impossible. It would avail nothing to build a levee on the bank of the Illinois river if the canal and southern outlet of the lake remained open. The temporary injunction issued on the original bill, as long as it was in force, completely stopped the progress of the work of the drainage district. Neither party to the stipulation knew at that time what the ultimate result of the litigation would be. This was the situation when the stipulation was entered into. Is this stipulation void because it is *ultra vires* the drainage district?

A drainage district organized under the statutes of this State is a municipal corporation for a special and limited purpose and has such powers as are deemed essential for the accomplishment of its objects. (*Badger* v. *Inlet Drainage District,* 141 Ill. 540.) Section 16 of the Drainage law provides that after the county court enters its final order confirming the report of the commissioners, such district shall be deemed duly organized as a drainage district by the name mentioned in the petition, and said district is declared to be "a body politic and corporate, * * * with the right to sue and be sued, and to have perpetual succession," and that the commissioners appointed, and their successors in office, shall, from the entry of such order of confirmation, constitute the corporate authorities of such drainage district, and that said commissioners may exercise the functions conferred upon them by law. Section 17

authorizes the commissioners to proceed to obtain the right
of way for all ditches, drains and levees or other work,
and to agree, if possible, with the owners upon the amount
of damages to be paid to such owners for the taking of
the right of way and damages to lands not taken, and re-
port the same to the court for its approval.  Said section
authorizes the commissioners, in the name of the district,
to condemn, under the eminent domain laws of the State,
any lands that may be necessary for right of way and which
cannot be obtained by agreement.  Section 17½, and sec-
tions to and including section 27, relate to the matter of
assessment of benefits and damages and confer upon the
commissioners powers in relation to those subjects.  Sec-
tion 28 is as follows: "Upon the organization of said
drainage district, it shall in its corporate name, by its com-
missioners from thenceforth, have power to contract and
be contracted with, sue and be sued, plead and be impleaded,
and to do and perform, in the corporate name of said dis-
trict, all such acts and things as may be necessary for the
accomplishment of the purposes of this act."

Municipal corporations are formed by the State for
purposes of local government and administration.  Such
corporations have extensive powers of local government,
including the power of making local laws.  There are nu-
merous other local corporate bodies which are classed as
municipal corporations, such as drainage districts, school
districts, and the like, which are organized for a special
purpose and are usually called *quasi* corporations.  The
chief difference between a municipal corporation, such as a
city or village, and a *quasi* corporation, is, that the latter
lacks the power of making local laws.  (2 Page on Con-
tracts, sec. 1008.)  Both classes of corporations have an
implied power to make contracts necessary to enable them
to exercise the powers and perform the duties which are
conferred upon them by law.  (*French* v. *Paving Co.* 181
U. S. 324; *Agnew* v. *Brall,* 124 Ill. 312.)  The power of

appellees to make any contract necessary to enable the district to perform its functions is expressly conferred by section 28 of the statute above quoted. Where the legislature, by statute, makes complete provision in regard to the power of the corporation to contract, and designates what purposes and in what manner such corporations may contract, such specific enumeration of purposes excludes any power, by implication, to contract. Under such a grant of power, in order to sustain a contract, it is necessary to find an express grant of power in the statute. (2 Page on Contracts, sec. 1011, and cases there cited.) Where there is a general grant of power by the legislature and the statute does not prescribe the method of making such contracts or enumerate the purposes for which such contracts may be made, the rule is that such corporation may make any contract that a natural person could make, if it is not expressly prohibited by the statute and is fairly entered into in furtherance of the general corporate purposes. The stipulation under consideration is not in violation of any statute of the State and its provisions are not contrary to any rule of public policy. This being true, the power of the drainage commissioners to enter into the contract depends upon whether the contract relates to a matter that is so entirely foreign to the purposes of the district that it must be held *ultra vires* and void.

Upon this question appellees rely with great confidence upon the case of *Badger* v. *Inlet Drainage District, supra.* In that case the drainage commissioners made a contract with Badger & Son by which they agreed to pay $1700 for the removal of a dam across Inlet creek and to levy an assessment upon the lands in the drainage district to pay for the same, and issued seventeen orders, of $100 each, to Badger & Son in payment for the removal of the dam. A levy was made to pay said orders but the collection of the tax was enjoined. An action of assumpsit was then brought upon the orders of the district. The circuit court

refused to hold that the orders were valid charges upon
the lands of the district, and that ruling was brought into
review in this court. This court affirmed the judgment,
and held that the drainage commissioners had no power to
contract for the removal of a dam not in any way connected
with any approved system of drainage work of the district.
The removal of this dam does not appear to have been
mentioned in any petition filed, and the property owners of
the district had been given no opportunity to be heard upon
the question respecting the character of the improvement
and its cost. This court, on page 548 of the opinion,
speaking by Mr. Justice Scholfield, said: "It results that,
in our opinion, when this drainage district was first organ-
ized there was no power in the commissioners to contract
for the removal of the dam, etc., of appellants, and that
before the commissioners could make any contract in that
respect they must present to the court appointing them a
report recommending the enlargement of the improvement
for which they were previously appointed, accompanied by
plans, profiles and an estimate of costs, including the re-
moval of the dam, etc., and afford to the land owner of
the district an opportunity to be heard upon the question of
confirming such report." That case is clearly distinguish-
able from the case at bar. There the commissioners en-
tered into the contract and proceeded to carry it out with-
out affording the land owners any opportunity to be heard
in reference to that improvement.

Appellees contend that at the time the stipulation in this
case was entered into there had been no petition filed in the
county court, no notice to the property owners and no order
of the county court authorizing the improvement. The
terms of the stipulation in the case at bar were assented
to, reduced to writing and signed before the petition for
the modification of the plans of the district was presented
to and acted upon by the county court. The stipulation,
however, on its face shows that it was not to be regarded

as effective for any purpose until the presentation of a petition and an order of the county court obtained authorizing the levy of a special assessment to pay for the improvement. In our opinion the validity of this stipulation is not to be tested as of the date when it was tentatively formulated and agreed to, but as of the date when it was filed in the circuit court and the chancery suit dismissed in pursuance thereof. If the drainage commissioners had power to enter into the stipulation on that date it is wholly immaterial whether it would have been enforcible prior to that time. The action of all parties concerned in causing the stipulation to be filed in court and procuring the dismissal of the law suit was, in effect, the entering into the stipulation on that day. There was a complete compliance in this case with the rule announced by this court in *Badger* v. *Inlet Drainage District, supra,* by filing a petition describing the proposed improvement, containing detailed plans and estimate of costs, notice to the land owners of the district and an opportunity to be heard, followed by an order of the county court approving the modification of the plans and ordering a special assessment to pay the costs thereof.

The only other cases cited and relied on by appellees in support of their contention upon this point are *Law* v. *People,* 87 Ill. 385, *City of Danville* v. *Danville Water Co.* 178 id. 299, and *City of Chicago* v. *Williams,* 182 id. 135. The *Williams case* was as follows: Williams sued the city of Chicago and recovered a judgment for stenographic and typewriting work done for the city under a contract with the chief of police and corporation counsel in a case wherein the chief of police was sued for false imprisonment, arising out of an arrest made in the course of his official duties. This court held that the city could not, under any circumstances, be held for damages for false imprisonment by reason of the wrongful conduct of the chief of police, and that said city had no interest in the litigation wherein

the stenographic services were rendered, and therefore the city was not liable for the fees of the stenographer. The right of recovery was not sustained, for the reason that the contract employing the stenographer by the chief of police did not concern any corporate purpose of the city. That case has no application to the situation presented by this record. The case of *City of Danville* v. *Danville Water Co.* arose out of the following facts: The city of Danville contracted with the Danville Water Company, by ordinance, for a supply of water at a given price per hydrant. The contract was for thirty years. Afterwards the city passed another ordinance reducing the price per hydrant that the city would be required to pay for its water supply. It did not appear that the second ordinance had been accepted by the water company. The water company continued to furnish water, and brought a suit, under the contract, for the amount due according to the rate fixed by the original ordinance. This court held that the legislature had the power to authorize cities to fix water rates, and that a contract fixing a uniform rate for thirty years was invalid, and could not deprive the city of its power, under the law, to fix rates from time to time, as in the judgment of the city council might seem reasonable and proper. That case has no application to the facts in the case at bar. There the contract purported to dispose of the legislative power of the city in regard to the fixing of water rates for thirty years. The appellee district has no legislative power, and if it had, the stipulation in question did not purport to dispose of or control such power. In *Law* v. *People* the power of a city to incur indebtedness in excess of the constitutional limit was involved, and it was held that the power to incur such excessive indebtedness did not exist. The power there sought to be exercised was in palpable violation of the constitution, which prohibits municipal corporations from incurring indebtedness to an amount, including existing indebtedness, in the aggregate exceeding five

per cent of the value of taxable property. A mere state-ment of the question decided in the *Law case* is sufficient to distinguish it from the case at bar.

The contracts sought to be enforced in *Law* v. *People, supra,* are apt illustrations of that class of municipal con-tracts which are wholly void because the municipality, un-der no conditions, could have the power to make them. Contracts entered into by a municipality which are pro-hibited by express provision of the law, or which under no circumstances could be legally entered into, are uni-formly held to be *ultra vires* and void, and cannot be ren-dered valid, as against the municipality, by receipt of the consideration or other matter of estoppel, and cannot be rendered valid and binding by any act of the municipality ratifying the same. (1 Dillon on Mun. Corp.—5th ed.—sec. 323.) There is another class of municipal contracts which are usually classed as *ultra vires* which are only so in a limited or secondary sense. These are contracts which are within the general powers of the corporation but which are void because the power was irregularly exercised, or where some portion of an entire contract exceeds the cor-porate powers but other portions of the contract are within the corporate powers. This class of municipal contracts is well illustrated by the case of *City of East St. Louis* v. *East St. Louis Gas Light and Coke Co.* 98 Ill. 415. In that case the city of East St. Louis contracted for the lighting of its streets with the gas company, at a fixed price per light, for the term of thirty years. A suit was brought by the gas company to recover the monthly installments that were past due under the contract. The city defended on the ground that the contract was *ultra vires* and that no suit could be maintained thereon. This court held that the light-ing of the streets was a purpose clearly within the corpo-rate powers of the city; that the contract had no element of illegality in it and that it was only illegal in respect to the term of its duration; that the corporation having re-

ceived the benefits under a contract which was merely *ultra vires*, it was bound to pay for the benefits received, and that the rule applicable to municipal corporations in this regard was the same as in the case of a private corporation. Many cases are to be found applying this rule, and the principle is now firmly established that the doctrine of *ultra vires* is not applied (except in cases where the contract is prohibited by some rule of law) where its enforcement would enable the municipality to obtain an unconscionable advantage of the other party to the contract, and that municipal corporations, as well as private corporations and natural persons, are bound by the principles of common honesty and fair dealing. Contracts made by a municipality which are merely *ultra vires* in a modified or secondary sense may be ratified and any defect in the manner of exercising the power thereby cured, and the municipality may likewise estop itself by acts *in pais* from setting up the defense of *ultra vires*. (2 Dillon on Mun. Corp.—5th ed.—sec. 797.)

The obligation imposed upon the drainage district by the stipulation in question was to construct a levee across Spring lake and place a lock therein to permit boats to pass through, and to maintain and operate the lock without charge, and to dredge out the channel below the dam and keep the same in repair. It can hardly be the subject of serious controversy that a drainage district has the power, under the statute, to build dikes and levees, and also the power to dredge out and deepen channels of any natural water-courses, that may be necessary to the proper drainage of the district. The particular subject matter, therefore, of this stipulation was not foreign to the purposes for which the district was organized. On the contrary, it is strictly within the purposes of its organization. It is true, the evidence shows that there was another method of draining the territory within this district, but that method contemplated the drainage of Spring lake as well as the

other territory within the boundaries of the district. The right to interfere with the waters of Spring lake was involved in the pending litigation. If the State succeeded, the district would be driven to adopt the plan provided for in the stipulation or some other similar plan, or abandon the drainage district altogether. Leaving out of view for the moment the existence of the stipulation, suppose the drainage commissioners had filed a petition in the county court setting up that Spring lake was a navigable body of water and that it was desirable and necessary to the proper drainage of the district to construct an improvement such as is provided for in the stipulation; suppose that all parties having a right to be heard upon the question of the character and cost of the improvement had been properly notified and brought into court, and upon a full hearing the county court had ordered the district to proceed with the improvement and all persons in interest had acquiesced in such judgment of the county court; could there be any doubt that the district would be liable on a contract made with a third party for the construction of such improvement? So far as the drainage district is concerned, we think that the validity of this stipulation should be tested upon the assumption that Spring lake was, in fact, a navigable body of water. If this be assumed, we see no escape from the conclusion that the improvement was clearly within the powers of the drainage district, and that the stipulation, after the county court had ordered the improvement upon full notice to all the land owners, was, when filed in the circuit court, a valid, binding obligation. It may be true that some portion of the work contemplated by the stipulation was intended to preserve the public easement that was claimed to exist in Spring lake and was not strictly necessary for the purpose of draining the lands of the district, but this is incidental to the main purposes of the stipulation. The drainage district was involved in litigation which in certain contingencies might defeat the pur-

poses of the organization. The law is well settled that municipal corporations have power to compromise and settle pending litigation. This power is necessarily implied from the power to sue and be sued. (2 Dillon on Mun. Corp.—5th ed.—sec. 821.) In *City of Shawneetown* v. *Baker,* 85 Ill. 563, this court held that a municipal corporation has power to submit to arbitration unsettled claims with the same liability to perform the award as would rest upon a natural person, such power being properly exercised by ordinance or resolution of the city council. In *Agnew* v. *Brall, supra,* it was held that a city could legally agree to accept one-half of a judgment rendered in its favor and release the claim, where the right of appeal existed and the defendant was threatening to appeal unless such compromise was effected, and that such agreement, when complied with by the defendant, was binding upon the city. While the drainage commissioners constitute the corporate authorities of the district and are by the statute clothed with the power to exercise the corporate functions of the municipality, the real parties in interest are the land owners whose property is liable to assessment to meet the corporate liability. The statute contemplates that the property owners in the district shall have notice and a right to be heard in the county court before their property can be legally assessed to pay for local improvements. Where a proper petition has been filed, notice given to the land owners, opportunity afforded for a hearing, and the county court, having complete jurisdiction of the subject matter and of the parties in interest, confirms the plans for the improvement and orders an assessment made therefor, the judgment of the county court is conclusive, in all collateral proceedings, of the power of the district to make the same. If it be said that the land owners of the district ought to have the right to question the power of the district to levy an assessment for the particular improvement here involved, it may be replied that they had such opportunity

on the hearing of the petition in the county court, and having failed to raise such question there, they are not deprived of any right by holding that they shall not be permitted to raise such question in any collateral proceeding.

Appellees contend that the stipulation was one that the Attorney General had no power to enter into. Upon this branch of the case but little need be said. The Attorney General, under the law, is the sole representative of the people and the canal commissioners and has the power to file informations such as the one filed against appellees, and has power, both under the common law and under the statute, to make any disposition of such causes that he deems best to the interest of the State. (*Hunt* v. *Chicago Horse and Dummy Railway Co.* 121 Ill. 638; *Canal Comrs.* v. *Village of East Peoria,* 179 id. 214.) No serious question can be raised in respect to the power of the Attorney General to dismiss a suit brought by him, either with or without any stipulation, upon behalf of the opposite party.

But it is said by appellees that the consent of the canal commissioners and the Attorney General to the closing of the artificial connection with Spring lake at the north end was not within their power. If it be assumed that the public had an easement in this canal, (which is disputed by appellees because, it is said, it was constructed without obtaining the right of way therefor,) still we have no doubt of the power of the Attorney General and the canal commissioners to consent to its being closed in consideration that another and more valuable means of ingress to and egress from Spring lake was provided before the closing of the canal. This is not a case of public officials contracting away valuable public rights, but it is simply the substitution, by consent, for one way of getting in and out of the lake of another which is concededly more advantageous and valuable to the public. All of the rights of the public in Spring lake are preserved by the stipulation.

Our conclusion is that the stipulation entered into between the parties to the original chancery suit is a valid, binding agreement upon all parties thereto, and that the circuit court erred in holding that such stipulation was void.

It results from what has been said that the decree below must be reversed and the cause remanded, with directions to the circuit court to enter a decree perpetually enjoining the appellees from proceeding in violation of the stipulation and from interfering in any way with Spring lake except in accordance with the terms of said stipulation.

*Reversed and remanded, with directions.*