(No. 22718.—

ERIC E. HALL, Appellant, vs. THE COUNTY OF COOK, Appellee.

*Opinion filed February 15, 1935—Rehearing denied April 3, 1935.*

URBAN A. LAVERY, (WEIGHTSTILL WOODS, of counsel,) for appellant.

THOMAS J. COURTNEY, State's Attorney, (HAYDEN N. BELL, and JACOB SHAMBERG, of counsel,) for appellee.

Mr. JUSTICE HERRICK delivered the opinion of the court:

The appellant, Eric E. Hall, (hereinafter called the plaintiff,) filed a petition for writ of *mandamus* in the circuit court of Cook county against the board of commissioners of Cook county by which he sought to compel such board to audit and allow his claim in the sum of $187,500 which he had filed against the county. Subsequently, and during the trial of the cause, the plaintiff changed his form of action to assumpsit, and filed his declaration against the county of Cook, appellee herein, (hereinafter called the defendant,) to recover for the same services for which the original suit was instituted. The declaration consisted of a special count and the common counts. The defendant entered its appearance and filed the plea of general issue. A jury was waived, the cause was tried before the court, and judgment was entered for the defendant. From that judgment the plaintiff appealed to this court. The cause was transferred to the Appellate Court for the First District. (*Hall* v. *County of Cook,* 353 Ill. 477.) The Appellate Court affirmed the judgment of the circuit court. (274 Ill. App. 503.) The cause comes here on leave to appeal.

The suit is based upon the claim of the plaintiff, as the county architect of Cook county, for services rendered by him in the preparation of certain plans, and work done in connection therewith, for the construction of a civic auditorium or municipal hall for the county. No evidence was offered on behalf of the defendant other than the appropriation bills for the fiscal years 1926, 1927 and 1928.

The evidence in the case shows that the plaintiff was appointed county architect in 1915 by the president of the board of county commissioners with the board's approval. His appointment was made thereafter annually. He served as such county architect from 1915 to and including the year 1932 and was acting in that capacity at the time of the trial in the court below. Each year he filed his bond

in the sum of $50,000, conditioned to discharge faithfully the duties of the office of county architect. No "salary," as that term is commonly used, was ever fixed by the board of commissioners for the plaintiff. On February 28, 1927, the commissioners adopted the following resolution:

"*Resolved,* That the office, position or place of employment of the county architect be and the same is hereby established, created and provided for, and that the rate of compensation shall be as follows: The compensation of the county architect shall be a fee of six per cent (6%) on work under his supervision in accordance with the rules of the American Institute of Architects, said compensation to be paid only on work ordered by the board of commissioners of Cook county or approved by it, provided that all plans and specifications for county work shall become the property of Cook county. The aforesaid compensation shall be divided, one and one-quarter per cent (1¼%) for the preliminary studies and sketches, three per cent (3%) for plans, specifications and details, and one and three-quarters per cent (1¾%) for supervising and superintending work, and the bills of the county architect shall be divided accordingly."

This resolution remained in force from the date of its adoption to the time of the trial.

The evidence shows that during the time the plaintiff served as county architect he had charge of the architectural work of all the county buildings constructed or upon which any work was done during the period of his employment. On October 4, 1926, the county board having in view the erection of a civic auditorium to be built at the expense of Cook county but to be used by both the county and the city of Chicago, adopted a resolution the terms of which, amongst other things, provided that the president of the board was authorized to appoint a committee to study and recommend ways and means for bringing about the construction by the city and Cook county, acting jointly, of a municipal hall. Acting under that resolution, the president of the board appointed a commission of more than two hundred persons, citizens of Cook county, which commission was thereafter designated as the Civic Auditorium

Commission of Cook county. Later the board adopted other resolutions in furtherance of the plan for the erection of a civic auditorium, conferring definite powers upon the Civic Auditorium Commission and making the commission agent in certain respects for the board.

An act of the legislature was passed, approved and in force June 1, 1927, by which it was provided that any county having a population of 500,000 or over should have power to acquire land for a site for a municipal hall, and to erect such municipal hall, with all necessary adjuncts thereto, from funds realized from the sale of bonds of the county, subject to a referendum vote upon the proposition, and in case the bonds should be authorized by the vote, the county should have the power to maintain, operate, control and regulate the use of the hall from the general funds of the county. It was further provided that all income from the hall should be kept in a separate fund and should be first applied to the expenses of maintenance. The act also provided that whenever the county board should pass a resolution providing for a referendum vote on the question of issuing the bonds of the county for the purpose of acquiring a site for and the erection of a municipal hall, the question should be submitted at the next general election or at a special election called for that purpose, and that the proposition for the bond issue should be submitted at the June judicial election of 1927 without further notice. The act provided that if it should be deemed necessary to levy taxes in addition to the statutory limitation of twenty-five cents on the $100 valuation, and also in addition to the constitutional limitation of seventy-five cents on the $100 valuation, for the purpose of paying the principal and interest of the bonds as they fell due, the question of additional taxes might be submitted to a vote of the people at the same time and on the same ballot as the question of the issuance of the bonds. (Cahill's Stat. 1927, chap. 34, pars. 123 *et seq.* (secs. 1 to 7, incl.) p. 749.) The act

was amended by an act of July 7, 1927. This amendment, however, is not material to any of the issues here.

On June 2, 1927, the board of commissioners adopted a resolution calling an election for June 6, 1927, that being the date of the judicial election, at which election thus called it was provided that there should be submitted to the voters of the county the question of issuing bonds in the principal sum of $15,000,000 for the purpose of acquiring a site for and the erection of a municipal hall, and also that there should be submitted at the same election the question of levying a tax for the purpose of paying the bonds, principal and interest. The proposition for the issuance of the bonds and the levy of an annual tax to pay them was carried by an affirmative vote of 147,700 as against a negative vote of 87,233. June 15, 1927, the commissioners adopted a resolution authorizing and directing the issuance of bonds in the sum of $15,000,000. On the same date the commissioners adopted another resolution, reciting, in substance, that the Civic Auditorium Commission was functioning, and that it was necessary that the committee on requirements, facilities, design and construction, (which was a sub-committee of the Civic Auditorium Commission,) complete a survey before the committee on location could function. It was further recited in the resolution that a study must be made of the larger convention halls both from an architectural and personal survey standpoint, and then ordered that the county architect be, and he was thereby, instructed to proceed with the analysis of plans of existing outstanding auditoriums for study by the committee on design and construction. The resolution ordered that a committee made up of eight members, three from the committee on construction and design, the county architect, three members of the board of county commissioners to be appointed by the president, and John F. Delaney, representing president Anton J. Cermak, be and they were thereby instructed to proceed with a survey of the

outstanding convention halls and to report back to the committee on construction and design, which in turn was to report to the county commissioners. Subsequent to the adoption of this last resolution a committee consisting of six of the leading architects and consulting engineers of Cook county had entered into an arrangement with the county architect for the payment by him of their services in assisting him in and about discharging his duties in the preparation of plans and designs for the auditorium and the superintending of the construction thereof. On August 10, 1927, the county board adopted another resolution, in which it was recited, in substance, that the committee on design and construction of the Civic Auditorium Commission had secured the services of the six architects and consulting engineers above mentioned, to act as associate architects and engineers with the county architect in an effort to bring to Cook county the most outstanding civic hall that architectural brains and ingenuity could devise. It was further stated in the resolution last named that the committee on design and construction had recommended that the county architect and his associates begin to function at once in the drafting of preliminary plans and otherwise take initial steps toward the plans for the building. The plaintiff, as county architect, was instructed to take the necessary steps and make the necessary preliminary sketches for the civic auditorium building.

Pursuant to the resolutions of the county board passed on June 15 and August 10, 1927, the plaintiff made an examination of and prepared a series of reproductions of the architectural plans of several different municipal auditoriums in different cities of the United States. In the course of the preparation of the plans he and three of his office associates visited different cities on the Atlantic and Pacific coasts as well as cities in the interior of the United States, studied the municipal halls in each of those cities and made reproductions of the architectural designs of the

municipal halls in several of the cities, which exhibits were submitted to the Civic Auditorium Commission, acting for the county board. Later the Civic Auditorium Commission, after having considered these different plans of municipal halls in other cities, instructed the plaintiff to prepare different plans and sketches for the proposed municipal hall. Acting on these instructions the plaintiff worked out and prepared plans and sketches presenting seven different schemes, each of which involved penciled sketches, from which photostatic copies were prepared. The plans were all drawn to scale and were submitted to the president and the board of county commissioners. These seven different plans severally detailed seven dissimilar designs for the proposed municipal hall. Scheme No. 5 called for a building at an estimated cost of $15,000,000 to be erected on public property, and scheme No. 6 called for a building at an estimated cost of $11,000,000, leaving $4,000,000 for the purchase of a site for the building. At the direction of the commission the plaintiff thereafter elaborated scheme No. 5 into a complete working sketch, known as No. 7-A. This plan was drawn in duplicate, with some variations so far as the floor plans were concerned, in a scheme called No. 7-B. A longitudinal plan of the interior was prepared according to scale and blue-prints thereof were furnished the commissioners. The plaintiff, also at the direction of the commission, prepared a floor plan with a seating capacity of 25,000 in the auditorium and 7000 in a concert hall, designated as scheme No. 8, which was based on scheme No. 5. Blue-prints of the floor plan of the proposed building last named and a cross-section sketch were also furnished to the commission. The plaintiff, also at the request of the commission, prepared prospective sketches showing the suggested location of the building upon two projects, namely, if located in a congested area or if located in a public or open space. These plans and sketches were submitted to the commission. The evidence shows that the

preparation, as county architect, of the various preliminary studies, sketches and plans above referred to, occupied substantially all the time of the plaintiff and his entire office force of from thirty-five to forty men for many months, and that he and his office force were still working for the board of county commissioners on the matter of the civic auditorium until April 30, 1928, when he received a letter directing suspension of any further work by reason of the adverse decision of this court in the case of *Campe* v. *Cermak,* 330 Ill. 463, to which reference is hereafter made. At the time the plaintiff received the notice on April 30, 1928, the evidence showed all of the above mentioned preliminary plans, studies and sketches for the proposed building had been completed by him; that his work as county architect had proceeded to a point where working plans for the actual construction of the proposed building were ready to be prepared on two alternative plans: (1) For a building to cost $15,000,000 to be erected on public property, where the site would be furnished without expense; and (2) for a building costing $11,000,000, leaving $4,000,000 for the purchase of a site.

On the 29th day of February, 1928, the board of county commissioners passed and adopted the annual appropriation bill. One of the appropriations embodied in the bill was as follows:

*"The Municipal Hall Building Fund, Series 'X'*—For the purpose of acquiring a site and erecting a municipal hall in and for the county of Cook, Illinois, authorized at an election held June 6, 1927, pursuant to law, (called special income fund 'R' for identification and reference,) $15,000,000."

The opinion of the Appellate Court sets forth the language of such appropriation bill in different words from those above recited herein. An examination of the record will disclose, however, that that portion of the appropriation bill quoted in that opinion is in the report of the com-

mittee on finance to the board of county commissioners. This report is embodied in the appropriation bill. The portion hereinabove quoted in this opinion is the appropriation as definitely made.

The evidence shows that during the year 1928 the county collected, by virtue of the taxes extended under the aforesaid portion of the annual appropriation bill, the sum of $750,000. Within a short time after the election purporting to authorize the aforesaid bond issue and to levy a tax in excess of the constitutional limitation to pay the bonds, a bill was filed in the circuit court of Cook county to restrain the county commissioners and the county clerk from issuing or selling the bonds of the county. The bill charged that the act of the General Assembly under which the election authorizing the issuance of the bonds was held was unconstitutional. This court held in *Campe* v. *Cermak, supra,* that the act was unconstitutional because it contained two unrelated subjects embraced both in the act and in the title; also, that the act did not afford the reasonable notice contemplated by the constitution to apprise the voters of Cook county of the submission at such election of the proposition to levy a tax in excess of the constitutional limitation to pay the bonds. The power of the county board to construct the building in question, issue bonds and levy a tax therefor under the general provisions of the statute was not raised nor passed upon in that case. The call of the election made by the county commissioners on June 2, 1927, did not in any way refer to the act of June 1, 1927.

On January 28, 1929, the county attorney gave a written opinion to the county comptroller with reference to the $750,000 tax collected by reason of the tax levy for the purpose of constructing the municipal auditorium. In that opinion the county attorney referred to this $750,000 as "an unexpended appropriation," and recommended that the appropriation be transferred to the general fund. There-

after the county board, by resolution duly adopted, directed that the county treasurer and comptroller be authorized and directed to transfer from the bond fund, series "X," the unexpended balance in the appropriation and levy for municipal hall purposes in the sum of $750,000 to the general fund. On June 9, 1932, the plaintiff presented his claim to the board of county' commissioners for services rendered as county architect, the value of the services being computed on the basis of one and one-quarter per cent of the cost of the $15,000,000 municipal building. On June 13, 1932, payment of the claim of the plaintiff was denied. On the trial of the instant case, evidence of qualified and competent practicing architects was introduced that one and one-quarter per cent of the cost of the building was a fair, just, reasonable and customary charge in that community for the services rendered by the plaintiff. This evidence was in nowise contradicted.

Numerous legal questions are presented by the record for decision. It is claimed by the plaintiff that he is an "officer" within the meaning of the constitution and the statute, and is therefore entitled to his compensation without the necessity of an appropriation therefor. In support of his claim the plaintiff cites the statute of this State by which it is provided, in substance, that the president of the board of commissioners of Cook county shall, with the advice and consent of the board, appoint the warden of the county hospital, the county architect, etc., "and the said officers and the superintendent of public service shall not be included in the said classified service." (Smith's Stat. 1933, chap. 34, par. 64, sec. 61, sub-sec. 20, p. 854; Cahill's Stat. 1933, chap. 34, par. 66, sec. 61, sub-sec. 20, p. 850.) Reliance is also had upon the records of the county commissioners, in which the county architect is referred to frequently as a county officer, and particularly the resolution of the county board passed on February 28, 1927. Certain rules and regulations of the county board

were also offered in evidence. By rule 17-G it was provided that, by and with the advice and consent of the board, the president should appoint certain "officers" for the period of one year and until their successors should be appointed. The county architect is named as one of the officers. The record shows that no fixed salary for the county architect was ever determined by the action of the county board, but his compensation was always fixed and paid upon a percentage basis for work done in the construction, alteration, repair or remodeling of county buildings. No oath of office was ever taken by the plaintiff, and neither the statute nor the rules of the county board in anywise define any duties of a public nature imposed upon him.

The evidence shows that over the long period of years during which the plaintiff has acted as county architect his earnings from that "office" varied greatly. Some years there were practically no earnings, while in other years the earnings amounted to large sums. His work was generally casual and not continuous. He was not required to maintain an office, to serve any particular hours or report to anyone. He was not obligated to have any relations with the public as such county architect. Section 24 of article 5 of our constitution defines the term "office" as follows: "An office is a public position, created by the constitution or law, continuing during the pleasure of the appointing power, or for a fixed time, with a successor elected or appointed. An employment is an agency, for a temporary purpose, which ceases when that purpose is accomplished." Mechem on Public Officers, in discussing the meaning of the term "office," (par. 4,) defines an office as follows: "The most important characteristic which distinguishes an office from an employment or contract is, that the creation and conferring of an office involves a delegation to the individual of some of the sovereign functions of government, to be exercised by him for the benefit

of the public; that some portion of the sovereignty of the county, either legislative, executive or judicial, attaches for the time being, to be exercised for the public benefit. Unless the powers conferred are of this nature the individual is not a public officer." In our judgment the plaintiff was not an officer within the legal definition of that term. *People* v. *Brady*, 302 Ill. 576; *People* v. *Coffin*, 282 id. 599; *Hughes* v. *Traeger*, 264 id. 612; *Bunn* v. *People*, 45 id. 397; *Metcalf* v. *Mitchell*, 269 U. S. 514, 70 L. ed. 384; High on Extraordinary Remedies, par. 265.

On the part of the defendant it is urged that there was no lawful appropriation made by the board of commissioners out of which the plaintiff's compensation could be paid. Want of a lawful appropriation is a matter of defense, and the burden was on the defendant to show that there was no lawful appropriation out of which the amount due the plaintiff could be paid. The defendant attacks the validity of the appropriation for the municipal hall building fund of February 29, 1928. In support of that point it urges that the bond issue and the vote upon the tax levied in excess of the constitutional limitation having been declared void in *Campe* v. *Cermak, supra,* there was no lawful appropriation for the purpose of paying the compensation of the plaintiff, and also that the appropriation of $15,000,000 for the purpose of erecting a municipal hall and procuring a site therefor did not include the compensation of the plaintiff. The record shows that the plaintiff during all the years he had served as county architect had always been paid out of the funds appropriated for the construction, repair or remodeling of some county building.

The object of an appropriation bill is to enable the taxpayer to compel the application of public funds to the purposes for which they were appropriated, to prevent the application of such funds to other purposes, and to prevent the expenditure of greater sums of money than are necessary for legitimate corporate purposes. The levying of a

gross sum where the several items are embraced within the same general designation is sufficient. (*Siegel* v. *City of Belleville,* 349 Ill. 240; *People* v. *Eastern Illinois and Missouri Railroad Co.* 335 id. 245; *People* v. *Irvin,* 325 id. 497; *People* v. *Millard,* 307 id. 556; *People* v. *Clark,* 296 id. 46; *People* v. *Chicago, Burlington and Quincy Railroad Co.* 306 id. 529; *People* v. *Jackson,* 272 id. 494; *People* v. *Illinois Central Railroad Co.* 271 id. 236; *People* v. *Chicago and Alton Railroad Co.* 273 id. 452.) It is a matter of common knowledge that where a building of the type, design and cost as was here contemplated by the county board is proposed to be constructed the services of an architect are necessarily required. The appropriation of this sum was for a site and a completed building. The services of the architect necessarily entered into the cost of the building, the same as the heating plant and the plumbing. It was not necessary that the fees of the architect for services to be rendered in and about the construction of the building be particularly or separately itemized. Such services were included within the general designation of the appropriation for the construction of the contemplated building, and if the appropriation bill was valid, then, in our opinion, the compensation of the county architect was lawfully included in the amount appropriated for the construction of the building and the acquiring of the site therefor without specifying separately the item of the architect's fees. A statute must receive a reasonable and common-sense construction. The requirement that the particular purposes for which a particular tax is levied or appropriated shall be specifically stated is not to be carried beyond a practicable purpose.

The powers of the county are two-fold, viz.: its governmental powers and its business powers. Ordinarily an estoppel or waiver cannot be pleaded against a county for its failure to exercise its governmental powers or the exercise of its governmental powers in an improper man-

ner. This rule is not always true as to the exercise of the municipality's business powers. In the cases cited by the defendant where appropriation bills were attacked, the assault was made by some tax-payer or there was an entire absence of any attempt to pass an appropriation bill. Such is not the situation here. The county did pass an appropriation bill. The same rule of strict construction should not be applied in behalf of the county where it attempts to take advantage of its own failure properly to exercise its business functions as is involved in behalf of the tax-payer, who must pay the taxes sought to be levied. The appropriation in the case at bar was at least colorable, and as between the county and the plaintiff was sufficient.

It is further claimed on behalf of the defendant that by reason of the decision in *Campe* v. *Cermak, supra,* the county board was without authority to construct the building in question. The defendant misinterprets that decision. In passing upon the question of the validity of the tax the court merely held as void that portion thereof in excess of the constitutional limitation. The point was not decided in that case that the county of Cook could not, under any circumstances, build a municipal hall without further enabling legislation.

Section 7 of article 10 of our constitution has committed the management of the county affairs of Cook county to its board of commissioners. It is provided by section 26 of chapter 34 that the county boards of the several counties have the right to erect or otherwise provide, when necessary and the finances of the county will justify it, and keep in repair, the necessary county buildings. (Cahill's Stat. 1933, p. 842; Smith's Stat. 1933, p. 845.) By section 23 of the same chapter it is provided that the powers of a county as a body corporate shall be exercised by a board of supervisors and in the county of Cook by the board of county commissioners, and by the third subdivision of section 24 such county boards are authorized "to

make all contracts and do all other acts in relation to the property and concerns of the county necessary to the exercise of its corporate powers."

In *County of Coles* v. *Goehring*, 209 Ill. 142, it was held that the county board was itself the judge of the necessity of building a county building, and that the time of such erection, the style, capacity and cost are wholly committed to the board, with no responsibility to any power save the people; that the word "necessary," as used in the statute with reference to the power of the county board to construct buildings, is not to be interpreted as referring to such measures as are absolutely and indispensably necessary, but includes all appropriate means which are conducive or adaptable to the end to be accomplished and which in the judgment of the board will most advantageously effect it; that the board not only determines when it is necessary to erect a building but also when the finances of the county will justify it. The words "when the finances of the county will justify it" are not to be construed to mean that the county has no power to make a contract for the repair or construction of a court house unless it has the cash in the treasury. When in good faith and without fraud the county board determines the finances justify the erection of a court house, the person with whom the contract is made to erect the building is not required to inquire into the correctness of its determination. The board's action upon the matter is conclusive and controlling. It was further held that the limitation on the power to levy taxes is not necessarily a limitation on the power to contract a debt. Statutes tending to effect objects of great public utility are to receive a liberal and benign interpretation. Potter's Dwarris on Statutes, 203, note.

Section 3 of article 10 of the constitution of Missouri (1875) provides that taxes may be levied and collected for public purposes only. The voters of St. Louis voted an issue of $5,000,000 of bonds for the acquisition of a

site and erection thereon of a civic building, to be known as the municipal auditorium and community center building. A bill was filed to enjoin the sale of the bonds on the ground that the purpose for which their proceeds were to be used was not a public purpose within the meaning of section 3 of article 10 and violated certain sections of the charter of the city of St. Louis. The Supreme Court of Missouri held the bond issue was not violative of the constitutional provision and sustained the issuance of the bonds. Numerous authorities involving the power of municipalities to construct public buildings similar to the municipal hall involved in the case at bar are reviewed in the opinion of that court. *Halbruegger* v. *City of St. Louis,* 302 Mo. 573, 262 S. W. 379.

With the numerous complex, perplexing and important problems of local, State and national government so frequently arising and the many diverse and varied interests of many different large groups of people in an area as densely populated as is Cook county, much can be said of the public necessity of a building as a community center for the holding of public meetings and assemblages for the purpose of public discussion of such local, State and national issues, as well as a convening place for those assemblages severally interested in educational, moral, musical, industrial, labor and other public purposes.

In the case of *People* v. *Spring Lake Drainage District,* 253 Ill. 479, which involved the question of the validity of a contract to which the drainage district had pleaded *ultra vires,* this court, speaking through Mr. Justice Vickers, said: "There is another class of municipal contracts which are usually classed as *ultra vires* which are only so in a limited or secondary sense. These are contracts which are within the general powers of the corporation but which are void because the power was irregularly exercised, or where some portion of an entire contract exceeds the corporate powers. * * * Contracts

made by a municipality which are merely *ultra vires* in a modified or secondary sense may be ratified and any defect in the manner of exercising the power thereby cured, and the municipality may likewise estop itself by acts *in pais* from setting up the defense of *ultra vires*."

It is not necessary to decide the issue here whether the county had the power to construct a municipal hall without further enabling legislation. The construction of necessary county buildings for public purposes was within the powers of the county. The county having ordered the work done and having levied a tax and collected three-fourths of a million dollars thereof for the purpose of erecting such municipal hall, and having appropriated the tax funds and transferred them to the general fund after notice of the invalidity of the act of the legislature, the county is estopped in this proceeding from setting up *ultra vires* as against the plaintiff, who in good faith rendered service for the defendant.

The point is made by the defendant that with the exception of those matters expressly excepted by the statute which require such charges to be paid without any action of the commissioners, no liability can lawfully be incurred without an appropriation previously made therefor in the annual appropriation bill; that no sums were appropriated for the purpose of paying for the municipal hall until the annual appropriation bill for the fiscal year of 1928, and the liability of the defendant to the plaintiff, if there is any liability, was incurred by the resolution of August 10, 1927, hence there can be no recovery for want of an antecedent appropriation. Under this claim the issue presented is, Was the liability "incurred" in 1928, after the passage of the appropriation bill of February 29, 1928, or on August 10, 1927? The evidence is that the preliminary studies and sketches were fully completed a short time before April 30, 1928; that they were then ready for the commence-

ment of working drawings, and that the preliminary studies and sketches had been delivered to the county board subsequent to February 29, 1928, and before April 30, 1928. The word "incurred," as used with reference to a debt, means "become liable for." (*Flanagan* v. *Baltimore and Ohio Railroad Co.* 83 Iowa, 639, 50 N. W. 60; *Beckman* v. *VanDolsen,* 70 Hun, 288, 24 N. Y. Supp. 414.) The word "incurred" is a word denoting the past tense. It must, therefore, mean a present liability—not a liability due in the future.

In *People* v. *City of Rock Island,* 271 Ill. 412, it was contended that the indebtedness of the city was "incurred" by the passing of an ordinance whereby the city agreed to make certain public improvements with a view of annexation of a village, and, no appropriation having been passed before the time of passing the annexation ordinance, the claimed obligation was void. This court there held, the fact that the city might be required at some future time to incur a debt which, in order to carry out the terms of the ordinance, would necessitate the authority of an appropriation ordinance, did not "incur" a present liability, and that until the time arrived for carrying into effect the plan for the public improvements no money need be appropriated for that purpose. In the case at bar the liability of the county to the plaintiff was not "incurred," within the correct meaning of that term, until after the passage of the appropriation bill on February 29, 1928, covering the fiscal year beginning December 1, 1927.

We do not agree with the defendant that the decision in *Campe* v. *Cermak, supra,* defeated the appropriation made by the appropriation bill and the tax levied and extended thereunder. The decision in that case was based on the charges made by the bill. It was not there contended, nor was it decided, that the county board could not levy a tax within the constitutional limitation for the purpose of erecting a municipal hall or civic auditorium, nor was it decided

that the tax levied was void except incidentally, as the same exceeded the constitutional limitation.

There was a valid employment of the plaintiff. Cook county assumed, before there was any enabling act, to have the power to construct a civic auditorium as a building necessary for the residents of the county. The county is not excused from the fulfillment of its obligation to the plaintiff because of the fact that the act of June 1, 1927, was found thereafter to be unconstitutional. (*Maher* v. *City of Chicago*, 38 Ill. 266; *East St. Louis* v. *East St. Louis Gas Light and Coke Co.* 98 id. 415; *People* v. *City of Rock Island*, 215 id. 488; *City of Chicago* v. *Pittsburgh, Cincinnati, Chicago and St. Louis Railway Co.* 244 id. 220; *People* v. *Spring Lake Drainage District, supra; McGovern* v. *City of Chicago*, 281 Ill. 264; *Avery* v. *City of Chicago*, 345 id. 640; *Bunge* v. *Downers Grove Sanitary District*, 356 id. 531.) The plans and prepared drawings are the property of the county. The plaintiff is entitled to recover. There is no conflict in the evidence as to the amount to be paid him under the contract. The value of such services proved under the *quantum meruit* counts is the same amount as provided by the plaintiff's contract of employment.

The plaintiff claims compensation on the basis of an expenditure of $15,000,000 for a municipal hall. This sum included the cost of a site in the event it was necessary to acquire private property for a site. To allow compensation on this basis would be to assume that the county board, had it proceeded with the construction of the municipal hall, would have adopted the plan providing for a $15,000,000 building, the site of which would have been public property without cost to the commissioners, rather than the $11,000,000 structure exclusive of the site. We cannot speculate on what would have been the action of the county board had it proceeded. The plaintiff is en-

548

titled to recover one and one-fourth per cent upon $11,-000,000 for his fees and services as county architect, but he is not entitled to recover interest. *County of Coles* v. *Goehring, supra.*

The judgments of the circuit court and Appellate Court are severally reversed. It would serve no useful purpose to remand the case to the circuit court for a new trial. Judgment is therefore here entered for the plaintiff, and against the defendant, for $137,500 and costs.

*Reversed and judgment here.*