MELBOURNE CORPORATION, Plaintiff-Appellee and Cross-Appellant, *v.* THE CITY OF CHICAGO, Defendant-Appellant and Cross-Appellee.

First District (1st Division)   No. 78-465

Opinion filed September 4, 1979.—Rehearing denied October 15, 1979.

William R. Quinlan, Corporation Counsel, of Chicago (Daniel Pascale and Edmund Hatfield, Assistant Corporation Counsel, of counsel), for appellant.

Hoffman & Davis and Foran, Wiss & Schultz, both of Chicago (Maurice L. Davis and Alvin L. Kruse, of counsel), for appellee.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff, Melbourne Corporation, brought a two-count action against the city of Chicago in the circuit court of Cook County. Count I alleged that the denial of renewal of Melbourne's city nursing home license, pursuant to an ordinance later adjudged unconstitutional, resulted in the abandonment and loss of its nursing home business. Count II alleged that Melbourne had sustained damages because the city failed to comply with a circuit court order mandating issuance of the city nursing home license. The city was held liable on each count and judgment subsequently was entered in the amount of $927,760. The city appeals both liability and damages. Melbourne has cross-appealed, contending that damages should be increased to $1,518,876.50.

Melbourne Corporation did business as a duly licensed nursing home from 1963 until June 30, 1971, in Chicago, Illinois. In February of 1971, Melbourne applied to the City of Chicago for renewal of its license. The city maintains dual responsibility for the licensing and regulation of nursing homes along with the State, pursuant to section 15 of the Nursing homes, sheltered care homes, and homes for the aged Act (Ill. Rev. Stat. 1971, ch. 111½, par. 35.30). At that time, section 136—15 of the Municipal Code of Chicago governed city licensing and regulation of nursing homes. Municipal Code of Chicago 1958, ch. 136, sec. 136—15.

On June 25, 1971, the Hearing Board on Denial and Revocation of Licenses for Nursing Homes, Sheltered Care Homes and Homes for the Aged of the city of Chicago (Board), a division of the Chicago Board of

Health, made specific findings of violations of various Board of Health rules and regulations regarding building maintenance and patient care. The Board, therefore, denied Melbourne's application for renewal of its city license.

On June 29, 1971, Melbourne filed an administrative review proceeding in the circuit court of Cook County. On July 1, 1971, that court stayed the decision of the Board pending final disposition of the administrative review proceeding.

On June 30, 1971, the Illinois Department of Public Health cancelled Melbourne's State nursing home license because of the findings and decision of the Board. In 1971 the Melbourne Nursing Home had a capacity of 188 beds. On June 30, 1971, Melbourne's census indicated a patient population of 160. Of those patients, all but two were placed in Melbourne and had their treatment funded by either the Illinois Department of Public Aid or the Illinois Department of Mental Health.

The State of Illinois immediately began withdrawing its patients from the Melbourne Nursing Home after June 30. By July 21, 1971, all State patients had been removed and only two private patients remained.

On October 15, 1971, the circuit court entered a final order on administrative review reversing the determination of the Board. The circuit court found that the Board's decision was not contrary to the manifest weight of the evidence. However, the court held that section 136—15 of the Municipal Code of Chicago was invalid because it failed to require expressly that the minimum requirements of the State Department of Health be observed. Accordingly, the circuit court ordered the city to issue Melbourne a 1971 license. It was further ordered that defendant and its agents were restrained and enjoined from interfering with the lawful operation of Melbourne's nursing home.

On October 21, 1971, counsel for Melbourne sent a copy of the circuit court's order to the Department of Public Health. Counsel received a letter in reply, dated November 4, 1971, signed by the chief of the Division of Health Facilities. The substance of that letter was that cancellation of Melbourne's State license was predicated upon the Board's order denying issuance of a city license, and "[t]herefore, this Department will not make any determination with respect to the restoration or reinstatement of the State license previously issued to this facility until the time for appeal by the City of Chicago has elapsed or a final determination has been made in this matter by the Appellate Court."

On October 22, 1971, Melbourne made a written demand upon the city collector for issuance of the city license in compliance with the circuit court's order. No city nursing home license was issued. Instead, the city filed a notice of appeal on November 12, 1971, and on December 2, 1971,

obtained an order from this court staying execution of the circuit court's order.

Following the entry of the stay pending appeal, the owners of Melbourne were advised by counsel that keeping the nursing home open during the pendency of the appeal would be impractical. Counsel advised them to mitigate their losses by closing the nursing home and selling the building and equipment. On December 3, 1971, Melbourne abandoned its nursing home business.

On September 20, 1973, this court affirmed the circuit court order of October 15, 1971 (*Melbourne Corp. v. Chicago Hearing Board* (1973), 14 Ill. App. 3d 589, 302 N.E.2d 729).[1] Defendant appealed to the Supreme Court of Illinois which, on November 27, 1974, affirmed the appellate court, with three justices dissenting. *Melbourne Corp. v. Chicago Hearing Board* (1974), 59 Ill. 2d 409, 322 N.E.2d 481.

On June 22, 1972, during the pendency of this appellate litigation, Melbourne filed the instant suit against the City of Chicago. The complaint alleged, *inter alia*, that defendant, through its Board, cancelled Melbourne's license pursuant to an ordinance subsequently found to be unconstitutional. Cancellation of Melbourne's State nursing home license and the resultant withdrawal of State patients was predicated upon the determination of defendant's Board. In short, Melbourne alleged that consequences resulting from the Board's determination forced plaintiff to discontinue its nursing home business. Therefore, Melbourne prayed for the fair market value of its business on or about June 30, 1971, in the amount of $1,500,000.

On February 18, 1975, Melbourne amended its complaint by adding a second count in which Melbourne stated that all State patients were removed by July 21, 1971, and that both private patients departed by September 30, 1971. Nonetheless, Melbourne maintained its place of business with a reduced work force, but with no patients in its care, while awaiting the disposition of the administrative review proceedings in the circuit court. Melbourne intended to resume the operation of its business in the event of a favorable ruling. On October 15, 1971, the circuit court reversed the Board. Melbourne sent a written demand and certified copy of this order to defendant, but no license was issued. Instead, the city

---

[1] An ordinance enforcement proceeding brought by the city of Chicago against Melbourne was consolidated in the appeal. In that proceeding defendants were charged with violations of section 136—15 of the Municipal Code of Chicago for failure to comply with various maintenance rules and regulations of the Chicago Board of Health. The circuit court had sustained Melbourne's motion to strike and dismiss the complaints, ruling that the ordinance is invalid and unconstitutional as an improper delegation of legislative authority because it allows the Board of Health to adopt rules and regulations without providing or defining standards to be followed. That judgment was also affirmed.

sought and obtained an appellate court stay of the circuit court order. When this stay was entered on December 2, 1971, it became apparent to Melbourne that there would be an extended period of time before the circuit court order could be enforced. Melbourne alleged it was compelled to abandon its business and suffered damages amounting to the value of its business.

Defendant's motion to dismiss both counts of the complaint was denied. Subsequently, by agreement of the parties, the issues of liability and damages were tried separately.

In connection with the trial on liability, the parties filed stipulations of fact and authenticity of documents, setting forth the chronology of events substantially as alleged in the complaint as amended. A bench trial was conducted on the issue of liability.

Ruby Boyd, who had been an assistant to the bookkeeper at Melbourne in 1971, testified that her duties included keeping a daily patient census. She testified that in July 1971, a caseworker from the Illinois Department of Public Aid appeared and informed her that patients would be moved out from day to day because their license was not renewed. By late July only two private patients were left.

Dr. Arthur J. Wolski, who with his wife was half owner of Melbourne, testified that he opened the Melbourne Nursing Home in 1963. From 1968 on, it operated at full capacity of 188 patients and at a profit. Dr. Wolski further testified that in July 1971, he received notice that Melbourne's Public Aid and Mental Health patients would be removed. He also testified that he had a discussion with counsel after the city appealed the circuit court's order. Counsel advised him that Melbourne's license would be withheld until the appeal was decided and that a decision would probably take a year or so. A purchaser for the Melbourne property was sought toward the end of 1971, and at the end of 1972 a sale was consummated.

On July 12, 1976, the circuit court entered judgment in favor of Melbourne on the issue of liability. On November 2, 1977, trial commenced on the issue of damages. As a result of testimony elicited and exhibits received, the court entered judgment for Melbourne and made the following findings:

"1. On June 30, 1971, the nursing home business of Plaintiff had a market value of $927,760.00;

2. Plaintiff is entitled to recover from Defendant, the June 30, 1971 market value of its nursing home business, exclusive of alleged future profit losses or interest on the said market value of said business prior to entry of this Order."

The city filed a timely notice of appeal of the circuit court orders,

contesting both its liability and the evidentiary support for the damages afforded. Melbourne cross-appealed, seeking the recovery of an additional $555,246 from the city for loss of profits.

We reverse on the issue of liability. Accordingly, contentions concerning damages need not be addressed.

## I.

Count I alleges that the city is liable for the termination of Melbourne's business because its board denied renewal of a city nursing home license based upon an ordinance later adjudged invalid and unconstitutional. Melbourne argues that withdrawal of its State license and patients was wholly predicated upon the Board's unlawful actions. We agree with the city's contention that provisions of the Local Governmental and Governmental Employees Tort Immunity Act (the "Act") (Ill. Rev. Stat. 1971, ch. 85, pars. 1—101 *et seq.*) preclude liability.

Initially, we consider the circuit court's determination that the Act, though constitutional, was inapplicable. We note that the Act applies to injuries of the sort alleged by Melbourne, *i.e.*, "damage to or loss of property." (Ill. Rev. Stat. 1971, ch. 85, par. 1—204.) Nonetheless, the circuit court labeled defendant's actions a "constitutional tort" and hence beyond the scope of the Act.

The court relied on *Bivens v. Six Unknown Named Agents* (1971), 403 U.S. 388, 29 L. Ed. 2d 619, 91 S. Ct. 1999. In *Bivens*, the Supreme Court held that actions by Federal agents violative of the fourth amendment's command against unreasonable searches and seizures may give rise to a cause of action for damages. Plaintiff sought recovery for humiliation and mental suffering resulting from actions of narcotics agents under color of Federal authority. The agents, acting without a warrant and allegedly without probable cause, made a forcible entry into and search of plaintiff's apartment. They conducted a strip search of his person and used unreasonable force. Their misconduct constituted a malicious disregard of well-known constitutional safeguards.

*Bivens* must be read in conjunction with *Wood v. Strickland* (1975), 420 U.S. 308, 43 L. Ed. 2d 214, 95 S. Ct. 992. There, high school students brought suit under 42 U.S.C. §1983 (1976), alleging that they had been expelled without due process of law. Plaintiffs sought damages, as well as declaratory and injunctive relief, against the school board and two administrators. The court rejected absolute immunity for defendants but held:

> "* * * [I]n the specific context of school discipline, we hold that a school board member is not immune from liability for damages under §1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would

violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. That is not to say that school board members are 'charged with predicting the future course of constitutional law.' *Pierson v. Ray*, 386 U.S., at 557. A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." 420 U.S. 308, 322, 43 L. Ed. 2d 214, 235, 95 S. Ct. 992, 1001.

■■■ Accordingly, to constitute a so-called "constitutional tort," defendant's actions must constitute a knowing or malicious violation of Melbourne's clearly established constitutional rights. Melbourne fails to allege that the Board's actions were malicious or that the Board knew or should have known that the ordinance was invalid. The Board acted in a quasi-judicial capacity to enforce a municipal public health ordinance of presumed validity. Defendant was "not charged with predicting the future course of constitutional law." (*Pierson v. Ray* (1967), 386 U.S. 547, 557, 18 L. Ed. 2d 288, 296, 87 S. Ct. 1213, 1219.) That Melbourne's constitutional rights were being violated was not "clearly" established until the decision of our supreme court and then only by a four-to-three margin. Therefore, under these circumstances, the "constitutional tort" doctrine is inapplicable and this case is governed by the Act's provisions.

■■■ In Illinois, municipalities and their employees enjoy no immunity from suit, except as provided by the Act. (See Comment, *Illinois Tort Claims Act: A New Approach to Municipal Tort Immunity in Illinois*, 61 Nw. U. L. Rev. 265 (1966), for the history of the doctrine of municipal tort immunity.) The following definitional provisions of the Act are pertinent:

"§1—202. 'Employee' includes an officer, member of a board, commission or committee, servant or employee, whether or not compensated, but does not include an independent contractor."

"§1—207. 'Public Employee' means an employee of a local public entity."

"§1—206. 'Local public entity' includes a county, township, municipality, municipal corporation, school district, school board, forest preserve district, park district, fire protection district, sanitary district, and all other local governmental bodies. It does not include the State or any office, officer, department, division, bureau, board, commission, university or similar agency of the State." (Ill. Rev. Stat. 1971, ch. 85, pars. 1—202, 1—207, 1—206.)

According to these definitions, it is apparent that the city of Chicago is a

local public entity and that the members of the Board are public employees of the city. The Act expressly provides separate grants of immunity for local public entities and public employees. (Ill. Rev. Stat. 1971, ch. 85, pars. 2—101 through 2—212 (art. II, parts 1 and 2).) Moreover, section 2—109 absolves a local public entity from liability "from an act or omission of its employee where the employee is not liable." (Ill. Rev. Stat. 1971, ch. 85, par. 2—109.) Consequently, the city may assert any immunity granted an employee to preclude its own liability.

Section 2—203 provides:

> "If a public employee acts in good faith, without malice, and under the apparent authority of an enactment that is unconstitutional, invalid or inapplicable, he is not liable for any injury caused thereby except to the extent that he would have been liable had the enactment been constitutional, valid and applicable." (Ill. Rev. Stat. 1971, ch. 85, par. 2—203.)

Section 1—203 defines "enactment" to include an ordinance. (Ill. Rev. Stat. 1971, ch. 85, par. 1—203.) Melbourne fails to allege bad faith or malice on the part of the Board or its members or of any other agent of the city. If section 136—15 of the Municipal Code of Chicago had been valid and constitutional, no liability could be predicated upon the Board's actions. Under section 2—109 of the Act, the city may assert this immunity afforded the Board members for good faith reliance on an ordinance ultimately adjudged invalid.

■■ Melbourne contends, however, that section 2—109 relates only to cases of vicarious liability on the part of the city for acts of its employees, based on the doctrine of *respondeat superior*. It argues that here the liability of the city is direct and primary for refusal to issue a license. We disagree. The city is a municipal corporation that can function only through the actions of its agents and officials. Melbourne may not evade the effects of the Act by suing the city itself, but not the Board officials whose actions or omissions constitute the alleged cause of action. The city may properly invoke the Board's immunity.

■■ The Board (and the city derivatively through section 2—109) is also protected by the Act because its licensing determination constituted discretionary action. Section 2—201 of the Act codifies the common law proposition that government officials are immune from suit for discretionary, as opposed to ministerial, acts or omissions. (*People ex rel. Munson v. Bartels* (1891), 138 Ill. 322, 27 N.E. 1091.) It reads:

> "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of

such discretion even though abused." (Ill. Rev. Stat. 1971, ch. 85, par. 2—201.)
This discretionary function provision should be interpreted to exclude from liability public employees who are involved in the decision-making or planning level of a government function. In denying Melbourne a city license, the Board considered the legal sufficiency of the charges, conducted a hearing, weighed the evidence and arrived at a determination. The Board was clearly exercising quasi-judicial discretion in its decision-making. Accordingly, no liability flows from the Board's decision.

Finally, defendant is immune under the Act because of its reliance on a licensing enactment. The applicable provisions from the Act follow:

"A local public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order or similar authorization where the entity or its employee is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked." Ill. Rev. Stat. 1971, ch. 85, par. 2—104.

"A public employee is not liable for an injury caused by his issuance, denial, suspension or revocation of or by his failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order or similar authorization where he is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked." Ill. Rev. Stat. 1971, ch. 85, par. 2—206.

Melbourne argues that the protections of these provisions are inapplicable. It asserts that neither the city nor the Board was "authorized by enactment" to make the licensing determination because the statute presupposes that a valid enactment was relied upon. Melbourne contends that here the municipal ordinance relied upon was void *ab initio*. The city's response is twofold. First, the void *ab initio* doctrine is inapplicable under the circumstances of this case. Second, even if the municipal ordinance was void *ab initio*, the enactment authorizing the city to control licensing of nursing homes is section 15 of the Nursing homes, sheltered care homes, and homes for the aged Act (Ill. Rev. Stat. 1971, ch. 111½, par. 35.30). The validity of this statute has not been impugned by Melbourne.
■■ We believe that the doctrine of void *ab initio* is inapplicable in this case. Generally, where a statute has been declared invalid by our supreme court, it is null and void as of the date of its enactment. In other words, an invalid law is void *ab initio* and confers no rights, imposes no duties and affords no protection. (*Johnston v. City of Bloomington* (1978), 61 Ill. App. 3d 209, 377 N.E.2d 1174.) However, this general rule cannot be

applied to work a hardship on a public officer who, in the performance of his duty, has acted in good faith in reliance on the validity of an enactment before any court has found the enactment invalid. *Cudahy Packing Co. v. Harrison* (N.D. Ill. 1937), 18 F. Supp. 250; *Hall v. Cook County* (1935), 359 Ill. 528, 195 N.E. 54; *Reich v. Board of Fire & Police Commissioners* (1973), 13 Ill. App. 3d 1031, 301 N.E.2d 501.

■■ The Board denied Melbourne's application for a city nursing home license pursuant to section 136—15 of the Municipal Code of Chicago, which implemented section 15 of the Nursing homes, sheltered care homes, and homes for the aged Act (Ill. Rev. Stat. 1971, ch. 111½, par. 35.30), part of which reads:

> "Any city, village or incorporated town may, by ordinance, provide for the licensing and regulation of nursing homes, sheltered care homes, and homes for the aged, or any classification of such homes, as defined herein, within such municipality, provided that the ordinance requires compliance with at least the minimum requirements established by the Department pursuant to Sections 4 and 11 of this Act. * * *"

Melbourne makes no allegations that the Board acted in bad faith or outside the scope of its duties. Moreover, the Board acted before any court had ruled on the validity of the municipal ordinance. Thus, the Board is not subject to the harsh results the void *ab initio* rule would render. Under section 2—109 of the Act, the city may invoke the Board's immunity.

Melbourne asserts that if sections 2—206 and 2—109, in combination, or section 2—104 of the Act provide immunity for the city's failure to issue a license to plaintiff, then these provisions are unconstitutional. It argues that these provisions constitute special legislation and violate the guarantee of equal protection of law (Ill. Const. 1970, art. I, §2, and art. IV, §13), because similar grants of immunity are not afforded the State. (See Ill. Rev. Stat. 1971, ch. 37, pars. 439.1 *et seq.* (State consent to suit pursuant to Court of Claims Act).) Specifically, Melbourne argues that the State could not assert immunity for reliance on a licensing enactment, so statutory provisions allowing local public entities that protection must be unconstitutional. We disagree.

The Illinois Constitution provides (Ill. Const. 1970, art. IV, §13):

> "The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination."

Propriety of classification determines whether or not a law is general or special. (*People v. Brown* (1951), 407 Ill. 565, 95 N.E.2d 888.) The General

Assembly has broad discretion in classifying objects and subjects for legislative purposes. (*Punke v. Village of Elliott* (1936), 364 Ill. 604, 5 N.E.2d 389.) When a classification is reasonable, is not arbitrary and bears a proper relation to the purposes of the act and the evil it seeks to remedy, the special legislation proscription is not violated. *Bridgewater v. Hotz* (1972), 51 Ill. 2d 103, 281 N.E.2d 317; *Henson v. City of Chicago* (1953), 415 Ill. 564, 114 N.E.2d 778.

■■ Courts will not assert their judgment against that of the General Assembly as to the reasonableness of a classification. Indeed, a classification must be palpably arbitrary in order to justify review. (*People ex rel. School District No. 153 v. Wickham* (1963), 29 Ill. 2d 550, 194 N.E.2d 206.) Whether a particular legislative enactment violates this special legislation provision is a matter decided upon standards very similar to those involved in equal protection analysis. *Mier v. Staley* (1975), 28 Ill. App. 3d 373, 329 N.E.2d 1.

■■ Concerning equal protection, we note that Melbourne's claim does not involve the consideration of any suspect classifications. Thus, we will use the "rational basis" test to determine if Melbourne was denied equal protection of law. We must determine whether the legislative classification is rationally designed to further a legitimate purpose. (See *People ex rel. Tucker v. Kotsos* (1977), 68 Ill. 2d 88, 368 N.E.2d 903.) If the classification has some reasonable basis, it is not unconstitutional, because it was not made with mathematical precision or because in practice it results in some inequality. *Dandridge v. Williams* (1970), 397 U.S. 471, 25 L. Ed. 2d 471, 90 S. Ct. 1153.

> "The Equal Protection Clause does not mean that a State may not draw lines that treat one class of individuals or entities differently from the others. The test is whether the difference in treatment is an invidious discrimination." (*Lehnhausen v. Lake Shore Auto Parts Co.* (1973), 410 U.S. 356, 359, 35 L. Ed. 2d 351, 354, 93 S. Ct. 1001, 1003.)

Applying these principles, we cannot say that the legislature's decision to provide immunity for local public entity licensing decisions but not for the State was arbitrary or unreasonable.

■■ The Illinois Constitution of 1970 abolished common law sovereign immunity in this State, but allowed the legislature to enact immunity statutes. (Ill. Const. 1970, art. XIII, §4.) Pertinent portions of the constitutional commentary demonstrate that the Constitutional Convention did not deem discrepancies in State and local public entity immunity a constitutional defect:

> "* * * The new provision gives the General Assembly power to determine the scope of liability of the State and of other units of

government, subject to the provisions of the United States and 1970 Illinois Constitutions. * * *

* * *

The Committee on General Government, in presenting the language substantially adopted by the Convention, stated in its report:

* * *

'The Court of Claims Act and the Tort Immunity Act would continue in force as neither is inconsistent with the Committee proposal. If the legislature seeks to preserve the existing pattern of governmental liability, the only implementing legislation which would be necessary is an amendment to the Court of Claims Act making it the exclusive remedy against the State.

'Of course, the General Assembly could, consistent with the Committee proposal, provide a uniform system applicable to all levels of government through modifications of the existing Tort Immunity Act.' " (Ill. Ann. Stat., Ill. Const., art. XIII, §4, Constitutional Commentary, 292-93 (Smith-Hurd 1971).)

A statute may be constitutional although the legislature did not extend its provisions to all cases that might be reached. (*Youhas v. Ice* (1974), 56 Ill. 2d 497, 309 N.E.2d 6.) The Act's provisions regarding licensing immunity need not be extended to the State to assure their validity.

■■ A statutory classification will not be set aside if any set of facts reasonably may be conceived to justify it. (*McGowan v. Maryland* (1961), 366 U.S. 420, 426, 6 L. Ed. 2d 393, 399, 81 S. Ct. 1101, 1105.) A highly conceivable justification for the State/municipality distinction is finances. One of the leading authorities on municipal corporations has discussed the widely accepted justification for tort immunity of local government entities in the following terms:

"The reason, as often expressed, is one of public policy, to protect public funds and public property. Taxes are raised for certain specific governmental purposes; and, if they could be diverted to the payment of the damage claims, the more important work of government, which every municipality must perform regardless of its other relations, would be seriously impaired if not totally destroyed. The reason for the exemption is sound and unobjectionable." (18 McQuillan on Municipal Corporations §53.24 (1963).)

Tort immunity under the Act may be waived by a local public entity to the extent insurance is procured pursuant to section 9—103 of the Act. (Ill. Rev. Stat. 1971, ch. 85, par. 9—103; *Marshall-Putnam Farm Bureau,*

*Inc. v. Shaver* (1973), 12 Ill. App. 3d 402, 299 N.E.2d 10.) Thus, the Act enables the implementation of the public policy of protecting public funds and property and preventing the diversion of tax monies from their intended purpose to the payment of damage claims. (See, *e.g.*, *Leviton v. Board of Education* (1940), 374 Ill. 594, 30 N.E.2d 497.) This can be accomplished by either invoking immunity or procuring insurance. In either event, disruptive damage claims are avoided.

■■ On the contrary, tort actions brought against the State pursuant to the court of claims act (Ill. Rev. Stat. 1971, ch. 37, pars. 439.1 *et seq.*) can result in judgments amounting up to $100,000. Specific statutory provisions provide for appropriation for these limited awards, however. (Ill. Rev. Stat. 1971, ch. 37, par. 439.23.) It is conceivable that the legislature determined that the State had sufficient resources to pay claims pursuant to the court of claims act without unduly hindering its ability to provide needed government services. The legislature may have believed that local public entities, lacking the revenue-producing powers of the State, could be more easily disrupted by payment to litigants of funds earmarked for specific governmental tasks. We will not second guess the legislature on matters of governmental resources and appropriations, since the legislative branch has traditionally been responsible for the public coffers. Accordingly, we cannot say that granting immunity to local public entities but not to the State is an arbitrary or irrational classification.

Finally, the difference in the effect of the State constitutional abolition of sovereign immunity might have caused a separate legislative approach to State and local public entity immunity. After the Illinois Constitution of 1970 (Ill. Const. 1970, art. XIII, §4) went into effect, local public entities were liable for all causes of action as a general rule. Exceptions were allowed only through legislative action, and the Act is a codification of all existing exceptions.

Despite the constitutional abolishment of sovereign immunity in 1970, the State, however, remained immune, under the eleventh amendment to the United States Constitution (U.S. Const., amend. XI), from suits brought by its citizens. (See *Fitts v. McGhee* (1899), 172 U.S. 516, 43 L. Ed. 535; *Hans v. Louisiana* (1890), 134 U.S. 1, 33 L. Ed. 842.) The constitutional commentary to article XIII, section 4, of the Illinois Constitution of 1970 indicates that that provision is "subject to the provisions of the United States [Constitution]." (Ill. Ann. Stat., Ill. Const., art. XIII, §4, Constitutional Commentary, at 292 (Smith-Hurd 1971).) Fundamental principles of federalism dictate this concession. Therefore, the legislature still acted under the general rule that the State remained immune from suit absent consent. Enactment of the court of claims act established all exceptions and limitations upon that general rule.

In short, the legislature approached the task of defining the bounds of State and local public entity immunity from two different vantage points. The fact that the overlap in resultant immunity is imperfect, inexact, not made with mathematical nicety or because in practice it results in some inequality does not make either statute constitutionally infirm. *Dandridge v. Williams* (1970), 397 U.S. 471, 25 L. Ed. 2d 491, 90 S. Ct. 1153.

## II.

We are of the opinion that Melbourne's contentions concerning count II are without merit. In essence, count II charges the city with failure to comply with the circuit court's order of October 15, 1971, mandating that a license issue.

Melbourne's argument may be divided into two parts. First, the city is liable for not complying with the circuit court's order from October 15 until this court stayed execution of that order on December 2, 1971. Second, defendant is liable for seeking and obtaining this stay rather than issuing Melbourne a license assuring the survival of its business.

This latter argument is misconceived. The city obtained the stay from this court in accordance with Supreme Court Rule 305(b) (Ill. Rev. Stat. 1971, ch. 110A, par. 305(b)), and Melbourne was afforded notice and opportunity to be heard on the issue of whether or not the stay should be granted. Melbourne indirectly seeks to attack this court's granting of the stay and impose liability for the city's lawful application of appellate procedure pursuant to rule.

We turn next to the issue of whether the city is liable for money damages for not complying with the circuit court's order before the stay was entered. We note that Melbourne sought recovery for $1,500,000, or the entire value of its business, due to the city's noncompliance from October 15 to December 2, 1971. However, the causation of Melbourne's business loss must be attributed to the removal of State patients by the State authorities, rather than to the city's failure to comply with the circuit court order. Even if a city license was issued, Melbourne still would not have obtained a State license.

■■ The State's policy is clearly set forth in the November 4, 1971, letter from the chief of the Division of Health Facilities, Department of Public Health, to counsel for Melbourne. That letter explained cancellation of Melbourne's State license was predicated upon the Board's administrative order. Moreover, the Department would make no determination regarding restoration of the State license until the city's time for appeal had lapsed or a final appellate determination had been reached. All State patients were removed from the Melbourne facility, and Melbourne had abandoned its business well in advance of a final appellate decision. Under these circumstances, we find the city's failure to obey the circuit

court order, which was stayed on appeal, did not cause the termination of Melbourne's business. Accordingly, the damages prayed for, which constitute the value of the business, cannot be sustained.

Even though Melbourne is not entitled to recover for property loss on count II, we will consider whether the city's failure to obey the court order gave rise to any other money damages not specifically prayed for in Melbourne's amended complaint. On October 15, 1971, the circuit court reversed the Board's finding that Melbourne's license should not be renewed. To implement this order, the court issued a mandatory injunction compelling the city to grant Melbourne a 1971 license and a restraining order prohibiting interference with Melbourne's business. Melbourne alleged that rather than comply with these injunctions, defendant appealed and was granted a stay pending appeal by this court on December 2, 1971.

The record supports Melbourne's assertion that the city did not immediately comply with the circuit court order. However, as in count I, Melbourne fails to allege or prove defendant's actions were done maliciously or in bad faith. The circuit court's order was issued on October 15, 1971. On October 21, counsel for Melbourne directed a letter to the city collector, enclosing a certified copy of that order and requested compliance. On October 27, the city collector addressed a letter to the Corporation Counsel's office, enclosed the letter received from Melbourne and requested a legal opinion as to whether or not to issue a city nursing home license. On December 8, the corporation counsel's office sent a legal opinion to the city collector informing him that a notice of appeal had been filed on November 12 and that the circuit court's order had been stayed by the appellate court on December 2. Therefore, the city collector was advised not to issue a license until the matter had been finally determined by the appellate court.

■■ These facts indicate defendant was merely exercising its constitutional right to appeal from a final judgment of the circuit court (Ill. Const. 1970, art. VI, §6), and its right under the Supreme Court Rules to stay that judgment pending appeal. (Ill. Rev. Stat. 1971, ch. 110A, par. 305(b).) We believe that any delay occasioned by the city can be attributed to the necessary communications, interplay and functioning of its agents and cannot serve as a basis of liability.

■■ In any event, the circuit court's order was essentially injunctive in nature. Both mandatory and negative injunctive relief was afforded Melbourne. Defendant's violation of these injunctions constituted a contempt of court and was punishable as such. (*Porter v. Alexenburg* (1947), 396 Ill. 57, 71 N.E.2d 58; *Keck v. Keck* (1972), 8 Ill. App. 3d 277, 290 N.E.2d 385, *reversed on other grounds* (1974), 56 Ill. 2d 508, 309 N.E.2d 217.) Contempt may be either civil or criminal depending on the

circumstances. *People v. Marcisz* (1975), 32 Ill. App. 3d 467, 334 N.E.2d 737, *affirmed in part, reversed in part on other grounds, sub nom. Marcisz v. Marcisz* (1976), 65 Ill. 2d 206, 357 N.E.2d 477.

■■■■■ In this instance, the purpose of a contempt proceeding would be to advance the remedies of plaintiff; accordingly, contempt would be civil. (*City of Park City v. Brosten* (1974), 24 Ill. App. 3d 442, 321 N.E.2d 15, *cert. denied* (1975), 423 U.S. 838, 46 L. Ed. 2d 57, 96 S. Ct. 66.) Penalties for civil contempt are remedial, coercive and punitive (*People v. Marcisz*), and either a fine or imprisonment, or both, may be ordered. (*City of Tuscola v. Otto* (1975), 33 Ill. App. 3d 853, 338 N.E.2d 484.) Since defendant is a municipal corporation, imprisonment would be inappropriate. However, in the absence of statutory authorization, the court is without authority to recompense plaintiff for its damages. (*Eberle v. Greene* (1966), 71 Ill. App. 2d 85, 217 N.E.2d 6.) Melbourne has cited no statutory authorization for damages and we have found none.

■■ The foregoing principles demonstrate that Melbourne was not without remedy for defendant's disobedience of the trial court's injunctions. The proper practice was for Melbourne to give notice (*People v. Marcisz*) and issue a rule requiring defendant to show cause why it should not be held in contempt of court. (*Sloan v. People* (1904), 115 Ill. App. 84.) The power to punish a violation of an injunction rests in the court which granted it (*Ossey v. Retail Clerks' Union* (1927), 326 Ill. 405, 158 N.E. 162), and Melbourne failed to avail itself of this proper remedy. Accordingly, liability and damages based on the city's failure to comply with the trial court's injunction cannot stand.

For all of the aforementioned reasons, the judgments of the circuit court of Cook County against the city of Chicago are reversed and plaintiff's cross-appeal is dismissed.

Judgments reversed and cross-appeal dismissed.

GOLDBERG, P. J., and CAMPBELL, J., concur.