**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230446-U

Order filed June 3, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| JAMES MCFARLAND, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-23-0446 |
| | ) | Circuit No. 23-LA-197 |
| MAYOR ROBERT O'DEKIRK, SEAN | ) | |
| CONNOLLY, Individually, and THE CITY | ) | |
| OF JOLIET, | ) | Honorable |
| | ) | Gary Dobbs, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE DAVENPORT delivered the judgment of the court.
Presiding Justice McDade and Justice Brennan concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The circuit court properly dismissed defamation action. Although not immunized under the Tort Immunity Act, defendant's allegedly defamatory statements were absolutely privileged under the common law.

¶ 2     Plaintiff, James McFarland, appeals the dismissal of his defamation action against defendant Sean Connolly, an attorney retained by the City of Joliet (City) to serve as its inspector general. The circuit court found Connolly immune from liability under the Local Governmental

and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1-101 *et seq.* (West 2022)). We affirm on other grounds.

## I. BACKGROUND

### A. Original Complaint

In March 2023, McFarland, a former City councilman, filed a defamation *per se* action against the City, its mayor, Robert O'Dekirk, and its inspector general, Connolly.[1] The complaint alleged O'Dekirk engaged Connolly as the City's inspector general in March 2022, after which Connolly opened a "partisan, unfair, [and] biased" investigation into allegations a City councilman had levied against O'Dekirk in November 2020. The investigation culminated in a report authored by Connolly and dated March 1, 2023 (Report), followed by the City's publication of the Report on its website. According to the complaint, the Report was defamatory, effectively accusing McFarland of committing the criminal offense of conspiracy. 720 ILCS 5/8-2 (West 2022).

The Report stated McFarland conspired with a "cabal" of five individuals to damage O'Dekirk's reputation by pressuring a City councilman to file a false police report alleging O'Dekirk had committed the offense of intimidation, a Class 3 felony. 720 ILCS 5/12-6 (West 2022). According to the police report, McFarland advised the councilman that O'Dekirk told a "person" he had obtained a photograph of the councilman's genitalia and intended to use the photograph against the councilman if he ran for reelection. Upon learning this, the councilman felt compelled to vote in line with O'Dekirk's wishes and was apprehensive about seeking reelection.

The Report called McFarland's story a "total fabrication" and a "bogus story." It identified McFarland as a "controversial figure in Joliet" and "a one-term Joliet Councilman who resigned

---

[1]McFarland does not appeal the dismissal of his action as to defendants O'Dekirk and the City; accordingly, we discuss allegations related to O'Dekirk and the City only to the extent it provides context for Connolly's alleged conduct.

after it was discovered he resided in Frankfort." It stated McFarland owns a print shop in Frankfort and claims to work as a social worker despite there being no record of him holding an Illinois social worker license. The Report concluded with a recommendation that the city council publicly condemn McFarland's role in the conspiracy to damage O'Dekirk's reputation.

¶ 8       The complaint alleged Connolly intentionally caused harm to McFarland's print shop business—not relevant to any legitimate investigation—by falsely reporting McFarland worked as a social worker without a license. The complaint disputed the Report's claims, alleging McFarland did not pressure the councilman into filing a police report, did not claim to be a social worker, and did not lie about being informed O'Dekirk was in possession of sensitive photographs of the councilman. The complaint alleged McFarland's only communication with the councilman was an October 2020 telephone call in which he urged the councilman not to resign from his position on the city council.

¶ 9                                          B. Amended Complaint

¶ 10      In June 2023, McFarland amended his complaint, in part, to sue Connolly in his personal capacity. In addition to the original allegations, the amended complaint alleged the City's inspector general ordinances (Joliet Code of Ordinances § 2-505 *et seq.* (adopted Jan. 4, 2022)), which allowed the mayor to appoint the inspector general, violated the Illinois Municipal Code (Municipal Code) (65 ILCS 5/1-1-1 *et seq.* (West 2022)). It alleged, moreover, that Connolly's Report was void *ab initio* "in that [Connolly] had no legal authority to conduct any investigation or draft any report on behalf of the [City] in the first place."

¶ 11      Attached to the amended complaint was the Report and the police reports it relied on. The engagement agreement was also attached. The agreement provided, in part, "Client [*i.e.*, the City] appoints Inspector General [*i.e.*, Connolly] to provide services in connection with lawful Inspector

3

General duties consistent with Illinois law and City of Joliet ordinances"; "Client agrees to pay by the hour as set forth on the attached rate schedule [$225 per hour]"; and "Inspector General shall send Client periodic statements for costs incurred." The agreement did not include details regarding job expectations and did not provide a duration for the engagement. It included, however, a section titled "Conclusion of Services," providing, in part, "When Inspector General's services conclude, all unpaid charges shall immediately become due and payable." O'Dekirk signed the agreement on behalf of the City.

¶ 12                                    C. Motion to Dismiss

¶ 13       Connolly moved to dismiss the amended complaint under section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2022)). He argued affirmative matter barred the defamation claim because (1) his communications as inspector general were absolutely privileged, (2) his investigation was in furtherance of his official duties, affording him a qualified privilege, and (3) he had immunity under sections 2-201 and 2-202 of the Tort Immunity Act (745 ILCS 10/2-201, 2-202 (West 2022)). Additionally, Connolly argued the complaint failed to state a claim for defamation *per se* because it did not allege Connolly published the Report to a third party.

¶ 14       In response, McFarland argued Connolly's engagement as inspector general was void *ab initio* because O'Dekirk acted beyond his mayoral authority to engage Connolly based on unconstitutional municipal ordinances. According to McFarland, the Municipal Code authorized the City's manager, not its mayor, to engage an inspector general. He argued Connolly's improper engagement conferred no rights, created no office, and afforded no immunities to Connolly from a defamation action.

¶ 15       In September 2023, the circuit court found the Tort Immunity Act immunized Connolly as an employee acting within the scope of his employment and not engaged in willful or wanton

4

activity. The court noted that "no court has found that [Connolly] wasn't appointed validly" and it was "not going to reach *** that point because that's not before me." It found that even if the relevant City ordinances were later held unconstitutional, Connolly would be immune under section 2-203 of the Tort Immunity Act. 745 ILCS 10/2-203 (West 2022) (extending immunity to public employees who act in good faith under apparent authority of an enactment that proves to be unconstitutional). Accordingly, the court granted the motion to dismiss with prejudice.

¶ 16    This appeal followed.

¶ 17                                II. ANALYSIS

¶ 18    McFarland argues Connolly's section 2-619.1 motion to dismiss should have been denied and urges us to reverse and remand this matter for further proceedings.

¶ 19    Section 2-619.1 of the Code of Civil Procedure permits the filing of a hybrid motion to dismiss raising both section 2-615 and section 2-619 grounds for dismissal. *Kucinsky v. Pfister*, 2020 IL App (3d) 170719, ¶ 33. While a section 2-615 motion to dismiss challenges a complaint's sufficiency based on facial defects (735 ILCS 5/2-615 (West 2022)), a section 2-619 motion admits the complaint's sufficiency but raises defects, defenses, and affirmative matter to defeat the cause of action (735 ILCS 5/2-619 (West 2022)). Under either section, the pleadings and supporting documents are construed in the light most favorable to the nonmoving party. *Kucinsky*, 2020 IL App (3d) 170719, ¶ 33. We review a complaint's dismissal *de novo* and can affirm on any basis in the record, irrespective of the circuit court's reasoning. *Id.* ¶ 34.

¶ 20    McFarland argues the Tort Immunity Act does not immunize Connolly from the defamation claim. He contends Connolly was improperly and unconstitutionally engaged as the City's inspector general and was therefore acting in his individual capacity. McFarland relies on the void *ab initio* doctrine, arguing the City's inspector general ordinances were inoperative as

5

though never in existence. He urges us to find Connolly's inspector general office a nullity and Connolly not entitled to any immunities.

¶ 21 In response, Connolly argues McFarland failed to establish the unconstitutionality of Connolly's appointment as inspector general. He notes the relevant City ordinances have never been held unconstitutional and McFarland's arguments are unsupported by constitutional authority. He also challenges the strict application of the void *ab initio* doctrine, arguing our supreme court has taken a more tempered approach to the doctrine. Finally, he argues the Tort Immunity Act immunizes his conduct as inspector general and further argues the defamation claim could never succeed because the amended complaint does not allege Connolly "published" the Report.

¶ 22 In reply, McFarland emphasizes Connolly was never a City employee because he was improperly retained as inspector general "under an unconstitutional ordinance that bypassed the Manager form of local government that the City of Joliet had adopted." He argues the void *ab initio* doctrine is "alive and well," Connolly did not conduct his investigation in good faith, and the communication of interoffice reports within a corporation constitutes publication for defamation purposes.

¶ 23                          A. Void *Ab Initio* Doctrine

¶ 24 The void *ab initio* doctrine provides, " 'An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed.' " *Perlstein v. Wolk*, 218 Ill. 2d 448, 454 (2006) (quoting *Norton v. Shelby County*, 118 U.S. 425, 442 (1886)). McFarland asks us to apply the void *ab initio* doctrine to the City's inspector general ordinance. According to McFarland, the ordinance is unconstitutional "to the extent that it allows the Mayor to appoint an

6

inspector general" because the Municipal Code allows only the City manager to appoint an inspector general. See 65 ILCS 5/5-3-7 (West 2022) ("The council *** shall appoint a municipal manager, who shall be the administrative head of the municipal government and who shall be responsible for the efficient administration of all departments."). McFarland asserts Connolly's appointment was made by the mayor, not the City manager, and urges us to find Connolly's inspector general office a nullity.

¶ 25    McFarland's argument is incomplete. He does not explain how the alleged procedural defects in Connolly's appointment rise to the level of a constitutional violation. In fact, he does not point us to any constitutional provision as the basis for his purported constitutional challenge. "Ordinances are presumed constitutional, and the party challenging them has the burden to demonstrate a clear constitutional violation." (Internal quotation marks omitted.) *McGrath v. City of Kankakee*, 2016 IL App (3d) 140523, ¶ 10.

¶ 26    McFarland has failed to rebut the presumption of constitutionality. He has not argued, let alone demonstrated, a constitutional violation. Illinois Supreme Court Rule 341 requires an appellant's argument to "contain the contentions of the appellant *and the reasons therefor, with citation of the authorities* and the pages of the record relied on." (Emphasis added.) Ill. S. Ct. Rule 341(h)(7) (eff. Oct. 1, 2020). "Arguments that do not comply with Rule 341(h)(7) do not merit consideration on appeal and may be rejected by this court for that reason alone." *In re Marriage of Hendry*, 409 Ill. App. 3d 1012, 1019 (2011). Inexplicably, McFarland has invoked no constitutional provision as the basis for his purported constitutional challenge. He argues the City's inspector general ordinances violate the Municipal Code, yet his brief fails to furnish this court with the ordinances and fails to meaningfully expound on the relevant Municipal Code provisions. More fundamentally, however, McFarland's brief offers no reason to deem this a question of

7

constitutional dimension and provides no discussion of relevant case law. "We have repeatedly admonished litigants that this court is not a depository into which the parties may dump the burden of argument and research." *People v. Woods*, 2024 IL App (3d) 230592, ¶ 31. Where McFarland has not developed a reasoned argument to support finding the inspector general ordinances unconstitutional, we find the issue forfeited and will not develop an argument on his behalf.

¶ 27    Thus, as no court has held the disputed ordinance unconstitutional, the void *ab initio* doctrine is inapplicable. Connolly's role as the City's inspector general, despite the alleged hiring impropriety, is undisputed. *Cf. Luciano v. Waubonsee Community College*, 245 Ill. App. 3d 1077, 1085 (1993) (noting even if alleged tortfeasor had obtained public employment by fraudulent means, it would not change the fact of her employment for purposes of the Tort Immunity Act). Accordingly, we now consider whether the Tort Immunity Act immunizes Connolly as the City's inspector general.

¶ 28                                B. Tort Immunity Act

¶ 29    The Tort Immunity Act's purpose is "to protect local public entities and public employees from liability arising from the operation of government." 745 ILCS 10/1-101.1 (West 2022). "By providing immunity, the General Assembly sought to prevent the dissipation of public funds on damage awards in tort cases." *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 368 (2003). Because the Tort Immunity Act operates as an affirmative defense, the burden lies on the public entities and public employees to properly raise and prove their immunity. *Id.* at 370. It is only when this burden is met that a plaintiff's right to recovery is barred. *Id.*

¶ 30    To fall within the Tort Immunity Act's protections, Connolly must have been a public employee at the time of the allegedly defamatory activity. See 745 ILCS 10/2-201 to 2-203 (West 2022). A "public employee" means "an employee of a local public entity" (*id.* § 1-207) and a "local

8

public entity" includes local governmental bodies such as municipalities, counties, and townships (*id.* § 1-206). The City is clearly a "local public entity"; however, it is unclear whether the City's inspector general is a "public employee."

¶ 31    Without analysis, Connolly simply reiterates the circuit court's finding that he was an employee acting within the scope of his employment. The Tort Immunity Act provides that an " 'employee' includes a present or former officer, member of a board, commission or committee, agent, volunteer, servant or employee, whether or not compensated, *but does not include an independent contractor.*" (Emphasis added.) *Id.* § 1-202.

¶ 32    From a preliminary look at the list of enumerated "employee" subtypes, a City inspector general could possibly qualify as an officer, agent, simple employee, or independent contractor. Connolly (ironically) argues the City's inspector general does not meet the definition of an officer. Noting the City ordinance allows the inspector general position to be "*ad hoc* for a specific purpose," Connolly asserts that, unlike an officer, the City inspector general is not assigned "the continuous performance of certain permanent public duties." See *Daniels v. City of Venice*, 162 Ill. App. 3d 788, 790 (1987) ("[A]n 'officer' of a municipality *** is assigned the continuous performance of certain permanent public duties."). He argues, further, that unlike an officer, the City inspector general is not appointed for a specified time, is not required to take an oath of office, and does not supervise any City employees. See *id.* ("Generally, an officer is appointed to serve for a specified time, takes an oath of office and has supervisory and discretionary authority which an employee does not.").

¶ 33    We agree with Connolly; the City inspector general's position lacks the indicia of an office. Although the position was created by a City ordinance, Connolly's appointment was based on an engagement agreement, which was essentially a service contract. The agreement characterized the

relationship between Connolly and the City as a relationship between a private attorney taking on the role of inspector general for a municipal "client." The agreement contemplated a "conclusion of services," indicating the position did not involve "permanent public duties." Moreover, compensation was not fixed by the city council but by a contract which provided an hourly fee schedule and required Connolly to bill his "client." In view of the hourly payment and billing structure, the agreement did not contemplate the "continuous performance" of duties. Indeed, at Connolly's hourly rate, continuous performance would result in prohibitively high fees.

¶ 34       Although the City's inspector general ordinances twice refer to the "office of inspector general," legislative nomenclature is not dispositive. *Moy v. County of Cook*, 159 Ill. 2d 519, 528 (1994). Underscoring this principle, the *Moy* court cited with approval *Hall v. County of Cook*, 359 Ill. 528 (1935), which held that a county appointee was not an officer where he lacked a fixed salary and his work was not continuous, even though county records often referred to him as an officer. *Id.* Similarly, here, Connolly's hourly pay structure and lack of permanent public duties outweigh the inspector general's "office" designation in the City ordinances.

¶ 35       Thus, having ruled out the possibility of officer status, we now consider whether Connolly was an independent contractor for the City or, as the circuit court found, an employee. "Whether a person is an employee or an independent contractor depends on the facts of the particular case." *Warren v. Williams*, 313 Ill. App. 3d 450, 456 (2000). "A determination of employee or independent contractor status will only be disturbed on appeal if it is against the manifest weight of the evidence." *Id.* "Many factors in the relationship of the parties are to be considered in making the decision, and no single one is determinative." *Id.* "The most important factor is the right to control the manner in which the work is done." *Id.* "Others include the method of payment, the work schedule, the right to discharge, who provides the tools, materials or equipment, the skill

required in the work to be done, whether the worker's occupation is related to that of the employer, and who deducts or pays for insurance, social security and taxes." *Id.*

¶ 36    In light of Connolly's engagement agreement, we cannot help but note the hallmarks of independent contractor status. The agreement's method of payment required Connolly to bill the City at his hourly rate. The agreement did not require the City to pay a steady income or provide a benefits package. The agreement did not require the City to deduct social security or income tax. The agreement did not include details regarding work schedule or location, effectively granting Connolly autonomy to control his hours and work independently. The agreement did not dictate the manner in which Connolly was to perform the duties outlined in the City's inspector general ordinances. The agreement allowed Connolly to hire consultants and investigators of his choosing so long as the City agreed to pay their fees. Finally, the work of the inspector general requires specialized law-related skills honed over years of experience. See Joliet Code of Ordinances § 2-507(b)(2) (adopted Jan. 4, 2022) ("The inspector general shall have * * * a minimum of ten (10) years of federal, state, or local government experience as a law enforcement officer, attorney or judge."). These factors all point to Connolly's status as an independent contractor.

¶ 37    We further note that the City manager, James Capparelli, acknowledged Connolly's non-employee status during the meeting at which the city council voted to appoint Connolly as inspector general. Capparelli stated,

> "This is a services agreement *** [Connolly is] not going to be an employee of the—he's just a *** just an attorney fulfilling that role. He doesn't work *** He's not a—an hourly or W-2 employee of the—of the City."

> * * *

11

"He's not a City of Joliet employee *per se*; he is a contractor \*\*\* under a services agreement." City Council of Joliet, Meeting Recording at 15:03-15:20, 20:48-20:55 (Feb. 15, 2022), https://joliet.granicus.com/player/clip/4204.

The record does not contain a transcript or recording of the city council meeting. However, it contains a reference to Capparelli's role in the meeting; Connolly argued before the circuit court that the City manager (*i.e.*, Capparelli) presented Connolly's appointment to the city council on February 15, 2022.

¶ 38        On appeal, Connolly furnishes this court with an internet link to the recorded city council meeting and asserts that, at this meeting, Capparelli "can be seen providing background and answering \*\*\* questions about Connolly." See *People v. Crawford*, 2013 IL App (1st) 100310 ¶ 118 n.9 (appellate court may take judicial notice of information on public website even when information is not in the record on appeal). Upon accessing the link, we were able to view an audiovisual recording of the February 15, 2022, city council meeting.

¶ 39        Judicial notice of statements in the public record is warranted where the record's reliability cannot reasonably be questioned. See Ill. R. Evid. 201(b) (eff. Jan. 1, 2011) (courts may take judicial notice of facts readily verifiable from sources whose accuracy cannot reasonably be questioned). Here, the reliability of the February 15, 2022, meeting recording cannot reasonably be questioned. The recording is archived in an online public database, features a timestamp index for easy navigation, and sits side by side with its corresponding meeting minutes, which state, in pertinent part, "A brief discussion was held regarding the appointment of Sean P. Connolly as the Inspector General, including his credentials and contracted service agreement." City Council of Joliet, Meeting Minutes (Feb. 15, 2022) at 2, https://joliet.granicus.com/player/clip/4204. We

therefore take judicial notice of Capparelli's representation to the city council that, if appointed, Connolly would not be an hourly or W-2 employee, but a contractor under a service agreement.[2]

¶ 40     We must stress, however, that even absent Capparelli's representation, the record clearly demonstrates Connolly's independent contractor status. *Supra* ¶ 36. The circuit court's finding that Connolly was a City employee was against the manifest weight of the evidence.

¶ 41     The circuit court thus erred in finding the Tort Immunity Act shielded Connolly from liability. As an independent contractor, Connolly was not a public employee and did not enjoy the protections of the Tort Immunity Act. See 745 ILCS 10/1-202 (West 2022) (an "employee" does not include an independent contractor). Further, since Connolly's independent contractor status is dispositive of this issue, we need not consider whether he was also an agent.

¶ 42                                         C. Privilege

¶ 43     The analysis does not end here, however, as this court may affirm on any basis in the record. *Kucinsky*, 2020 IL App (3d) 170719, ¶ 34. A defamation claim requires the *unprivileged* publication of a defamatory statement to a third party. *Dent v. Constellation NewEnergy, Inc.*, 2022 IL 126795, ¶ 26. In his motion to dismiss—though not on appeal—Connolly raised privilege as a defense to the defamation claim. Our common law recognizes two classes of privilege: absolute and qualified. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 585 (2006). According to Connolly, his statements were entitled to both.

¶ 44     Qualified privilege shields defamatory statements from liability only if made in good faith. *Mauvais-Jarvis v. Wong*, 2013 IL App (1st) 120070, ¶ 72. This privilege is ineffectual if "(1) false

---

[2]This court has previously taken judicial notice of statements in a televised news interview and a corresponding news article. *People v. Peterson*, 2022 IL App (3d) 220206 ¶ 14 n.2. We explained the media sources made the statements part of the public record and rendered them "readily verifiable and capable of instant and unquestionable demonstration." (Internal quotation marks omitted.) *Id.*

13

statements are made with malice or a reckless disregard for their truth, (2) the statements are not limited in scope, or (3) publication is not limited to proper parties." (Internal quotation marks omitted.) *Id.* In contrast, absolute privilege grants complete immunity from a defamation action, irrespective of the publisher's intent. *Id.* ¶ 71. This privilege is rooted in a policy that prioritizes the public interest over potential harm to an individual's reputation. See *Weber v. Cueto*, 209 Ill. App. 3d 936, 942 (1991). We turn first to absolute privilege.

¶ 45 Because absolute privilege provides unconditional immunity from defamation actions, it is necessarily narrow. *Belluomini v. Zaryczny*, 2014 IL App (1st) 122664, ¶ 21. It is limited, generally, to statements made during legislative, judicial, and quasi-judicial proceedings. *Id.* Notably, however, absolute privilege attaches to communications "made in the discharge of a duty under express authority of law." *Weber*, 209 Ill. App. 3d at 942 (citing *Larson v. Doner*, 32 Ill. App. 2d 471 (1961); *Cook v. East Shore Newspapers*, 327 Ill. App. 559 (1945)). Moreover, " '[o]ne who is required by law to publish defamatory matter is absolutely privileged to publish it.' " *Id.* (quoting Restatement (Second) of Torts § 592A).

¶ 46 Here, Connolly tendered the Report to O'Dekirk in the discharge of a duty under express authority of law. Section 2-506(a)(1) of the City Code authorizes the inspector general to investigate the performance of government officers and employees to detect and prevent misconduct in the City government's operations. Joliet Code of Ordinances § 2-506(a)(1) (adopted Jan. 4, 2022). It also requires the inspector general "to report to the mayor and the city council concerning the results of investigations." *Id.* § 2-506(a)(3). Connolly investigated allegations of mayoral misconduct—namely, that O'Dekirk had intimidated a councilman into voting according to his wishes and ultimately into not seeking reelection. This was a valid investigation under the City's ordinances. *Id.* § 2-506(a)(1).

14

¶ 47    McFarland, however, argues Connolly investigated him, and by doing so exceeded his enumerated powers under the City's ordinances. See *Id.* § 2-506(c) ("The powers and duties of the inspector general shall extend to the conduct of" (1) City employees and officers, (2) City contractors and subcontractors, (3) businesses seeking City contracts, (4) persons seeking to participate in City programs, and (5) City-backed charities and governmental bodies). McFarland maintains section 2-506(c) of the City Code prohibits the inspector general from investigating McFarland, as he was a non-resident who was not involved in any City program and was not a City officer, employee, contractor, or subcontractor.

¶ 48    This argument overlooks the subject of Connolly's investigation. Per the Report, Connolly was investigating certain *allegations*, not individuals. See *Brock v. Anderson Road Ass'n*, 287 Ill. App. 3d 16, 21 (1997) (where complaint conflicts with attached exhibit, the exhibit controls). By its very nature, an investigation into allegations requires a systematic inquiry into the basis and veracity of those allegations. See Merriam-Webster's Collegiate Dictionary 659 (11th ed. 2020) ("investigate" means "to observe or study by close examination and systematic inquiry"). A systematic inquiry, in turn, necessitates identifying any parties involved along with their respective roles. We recognize the Report impugned McFarland's character, introduced irrelevant matter related to McFarland's work, and concluded he had participated in a conspiracy to undermine a sitting mayor; however, there is no indication the investigation turned into a systematic or targeted probe of McFarland. According to the Report, Connolly found the blame was shared—to varying degrees—among six individuals, five of whom were either current or former City officials or employees. Construing the Report in the light most favorable to McFarland, we fail to see how Connolly "observ[ed] or stud[ied]" McFarland "by close examination and systematic inquiry." *Id.* In short, the Report does not substantiate McFarland's claim that Connolly investigated him.

15

¶ 49 Connolly tendered his Report to O'Dekirk as required by City ordinance. Joliet Code of Ordinances § 2-506(a)(3) (adopted Jan. 4, 2022). Consequently, any statements in the Report—defamatory or otherwise—were made in the discharge of Connolly's duty to report the results of an investigation conducted under express authority of law. They are entitled to absolute privilege.

¶ 50 Thus, despite his independent contractor status, Connolly is completely immune from McFarland's defamation action, and the circuit court correctly dismissed the amended complaint. Having reached this conclusion, we need not consider whether the conditions for qualified privilege are met. See *supra* ¶ 44. Moreover, because we have resolved the parties' appeal under section 2-619 of the Code, we need not address Connolly's section 2-615 argument.

¶ 51                                    III. CONCLUSION

¶ 52 The judgment of the circuit court of Will County is affirmed.

¶ 53 Affirmed.